UNITED STATES of America, Appellee,

v.

Arthur FULLER, Appellant.

UNITED STATES of America, Appellee,

v.

Thomas Lynn PORTER, Appellant.

UNITED STATES of America, Appellee,

v.

Larry SPEARS, Appellant.

Nos. 14205, 14375 and 14358.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 11, 1970.

Decided April 30, 1971.

Kale R. Alexander, Columbia, S. C. (David A. Fedor, Columbia, S. C., on brief), for appellants in Nos. 14,357 and 14,358, William H. Mills, Birmingham, Ala., for appellant in No. 14,205.

Joseph O. Rogers, Jr., U. S. Atty. (Thomas F. Batson and D. Gene Rickenbaker, Asst. U. S. Atty., on brief), for appellee.

Before SOBELOFF, WINTER and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge:

Appellants, Arthur Fuller, Thomas Lynn Porter, and Larry Spears, were indicted along with a fourth codefendant, Clyde Troulias, on two counts of violations of federal statutes prohibiting the use of interstate telephone facilities for gambling activities and a third count of conspiring together to commit the crimes charged in the substantive counts. Porter and Spears are residents of Greenville, South Carolina, and Fuller and Troulias are residents of Birmingham, Alabama. FBI investigation in both locations produced evidence tending to show that bookmaking operations on sporting events were being operated by Porter and Spears out of two trailers they occupied in Greenville and by Fuller and Troulias out of Fuller's home in Birmingham. There was also indication that gambling information or bets were exchanged by the four defendants via long distance telephone calls made from pay telephones in Greenville to Fuller's residence and Troulias' sister's residence in Birmingham.

Simultaneous searches were made of the trailers in Greenville and Fuller's home pursuant to search warrants. After a lengthy trial, the jury acquitted Troulias and found the appellants guilty on all three counts.

## I.

Appellant Fuller argues that there was an insufficient showing of probable cause for the issuance of the warrant for the search of his home in Birmingham.[1] The government contends that the written affidavit submitted by an FBI agent, coupled with oral testimony given by the agent under oath before the United States Commissioner who issued the warrant, was sufficient. Fuller argues that Rule 41(c), Fed.R.Crim.P., requires probable cause to be based solely on a written affidavit and that supplemental oral testimony is proscribed. We need not decide whether oral testimony can be used to supplement a written affidavit under Rule 41(c) since we conclude that the written affidavit alone was sufficient. The affidavit contained the following statements:[2]

(1) An unidentified informant, who had provided reliable information in the past, told the affiant, FBI Agent Osborne, that "Clyde Troulias was the biggest bookie in the Birmingham area"; that he was taking bets on sporting events; and that he was working with Arthur Fuller in his booking operation.

(2) Agent Osborne telephoned Clyde Troulias at his sister's residence and was told that he could be reached at Arthur Fuller's residence. Agent Osborne telephoned Arthur Fuller's residence and Clyde Troulias answered the phone.

(3) Agent Osborne personally observed Clyde Troulias and Arthur Fuller in the company of known gamblers. FBI records showed Clyde Troulias was convicted of a gambling offense in 1960 and arrested for bookmaking in 1967 after a raid by state officers on the residence of his sister.

(4) Agent Osborne was informed by FBI Agent Haas, who was conducting a gambling investigation in Greenville, South Carolina, that an unidentified informant, who had given Agent Haas reliable information in the past, had observed Thomas Lynn Porter and Larry Spears taking bets and giving out line information at two trailers occupied by them in Greenville. The informant also told Agent Haas that Spears and Porter were receiving line information from Birmingham.

(5) Agent Haas and other FBI agents observed Porter and Spears in five different telephone booths in Greenville at times when four calls were placed to the residence of Clyde Troulias' sister, Annie Lou Troulias, in Birmingham and five calls were placed to the residence of Arthur Fuller in Birmingham. The four calls to the Troulias' residence were made in November and December of 1968. The five calls to the Fuller residence were made in January and February of 1969. A survey of subpoenaed telephone records for these same five telephone booths showed 259 calls from the booths in Greenville to one of two phones at the Birmingham residence of Troulias' sister between August 1968 and January 20, 1969. The records also showed 75 calls from the five booths to the Birmingham residence of Arthur Fuller between January 18, 1969, and February 22, 1969.

■■ A magistrate issuing a search warrant may rely on the hearsay information provided by an unidentified informant if "a substantial basis for crediting the hearsay is presented." Jones v. United States, 362 U.S. 257, 269, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960). In order to show a substantial basis for crediting the hearsay, the affidavit must pass the two-pronged test of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12

---

1. The validity of the Greenville search warrant is not attacked on appeal.

2. The affidavit is recited in full in the appendix.

L.Ed.2d 723 (1964). The magistrate must be informed of (1) the underlying circumstances on which the affiant concludes that the informant is credible and (2) the underlying circumstances on which the informant based his conclusion that the person whose residence is to be searched is engaged in criminal activity. If the informer's tip is found inadequate under *Aguilar*, the magistrate may yet find probable cause to believe the tip if it can "fairly be said that the tip \* \* \* when \* \* \* corroborated by independent sources, is as trustworthy as a tip which would pass Aguilar's tests without independent corroboration." Spinelli v. United States, 393 U.S. 410, 415, 89 S.Ct. 584, 588, 21 L.Ed.2d 637 (1969).

■■■■ The affidavit in this case contains information supplied by two informants, one in Greenville and one in Birmingham. The Birmingham informant's tip is not supported by the circumstances on which the informant based his conclusion that "Clyde Troulias was the biggest bookie in the Birmingham area" and thus does not meet the *Aguilar* tests. It must, therefore, be disregarded. The Greenville informant's tip is another matter.

The credibility of the Greenville informant is supported by a statement that he had previously given Agent Haas reliable information. We think that a magistrate is entitled to infer that an informant who has provided information in the past which has proved to be accurate will probably continue to give accurate information in the future. We also think that the report of information from one named FBI agent to another agent who is the affiant, when both are working together on a joint investigation, is inherently credible. See United States v. Ventresca, 380 U.S. 102, 111, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). The Greenville informant's statement that Porter and Spears were taking bets and giving out line information was based on his personal observation, and, thus, this portion of his information meets both of the *Aguilar* tests. The informant's state-

ment that Porter and Spears were receiving their line information from Birmingham is not reported as being based on his personal observation. However, we feel that the statement regarding the large volume of phone calls made from five phone booths in Greenville to the Fuller and Troulias residences plus the statement that Porter on some occasions and Spears on others were seen in the phone booths when nine of these calls were placed supports an inference that the calls were made by Porter and Spears to Troulias and Fuller in connection with Porter and Spears' gambling activities. All of the calls before January 18 were made to the residence of Annie Lou Troulias and all of the calls after January 20 were made to the residence of Arthur Fuller. This supports Agent Osborne's conclusion in the affidavit that the Birmingham end of the gambling operation was transferred from the Troulias residence to the Fuller residence about January 19, 1969. During the period of January 18, 1969, to February 22, 1969, the calls from the five Greenville phone booths to the Fuller residence in Birmingham averaged more than two a day, which suggests something other than the casual conversation of friends.

Only probability and not a prima facie showing of criminal activity is required to sustain a search warrant. Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). A reviewing court is not to substitute its judgment as to probable cause, but only to determine whether there was a substantial basis for the magistrate's determination of probable cause. Jones v. United States, 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). We conclude that, based on the written affidavit alone, there was a substantial basis for the magistrate to conclude that Porter and Spears were probably engaged in gambling activity, that they were probably assisted or joined in this activity by Clyde Troulias and Arthur Fuller in Birmingham, that the link between Greenville and Birmingham was probably made by long distance phone calls, that the locus of the Birmingham

end of the operation was probably shifted from the Troulias residence to the Fuller residence, and that therefore gambling paraphernalia would probably be located at the Fuller residence.

## II.

■ During the search of Fuller's residence, two FBI agents answered two telephones located in the bedroom. The agents answered the phones for 25 minutes. The callers identified themselves by number and asked for the "line".[3] The agents, who had been prepared to do so, supplied the callers with the current "line" information. Testimony of the conversations was introduced into evidence.

Fuller argues that this was a seizure of the conversations and was outside the scope of the search warrant relying on Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927), and Stanford v. Texas, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965).

*Marron* was a prohibition case involving the execution of a search warrant which authorized searching for and seizing "intoxicating liquors and articles for their manufacture." 275 U.S. at 193, 48 S.Ct. at 75. When the prohibition agents raided the place, they found a speak-easy, not a still. In addition to discovering some liquor, they seized ledger books and bills. The Court said the ledger books and bills were outside of the scope of the warrant, but were admissible as material seized incident to a lawful arrest.

But that is not this case. The search warrant in *Marron* was very specific and the questioned items seized were wholly different in nature and kind from the items listed. In this case, the warrant authorized searching for and seizing "bookmaking records and wagering paraphernalia consisting of, but not limited to, accounting sheets, rundown sheets, betting slips, recap sheets, sports infor-

mation papers, miscellaneous line notations, line sheets, books of account, checks, money orders, and United States Currency * * *." The description is necessarily general and clearly contemplates that material relating to gambling activity but not precisely described might be seized. The intent of the generalized description is clearly to permit the seizure of any items directly related to the appellants' booking operation. The telephone calls answered by the agents were clearly a part of appellants' booking operation and, therefore, we think within the scope of the general language of the warrant.[4]

■ Nor do we think that a warrant which is limited to the seizure of items which are directly related to a booking operation to be the kind of general search prohibited by the Fourth Amendment. This is not a case where "the constitutional requirement that warrants must particularly describe the 'things to be seized' is to be accorded the most scrupulous exactitude [because] the 'things' are books, and the basis for their seizure is the ideas which they contain." Stanford v. Texas, 379 U.S. 476, 485, 85 S.Ct. 506, 511, 13 L.Ed.2d 431 (1965). The agents executing the warrant in this case were empowered to seize only a limited class of things, that which was related to a bookmaking operation. "In the search of a gambling establishment the same descriptive particularity is not necessary as in the case of stolen goods." Nuckols v. United States, 69 App.D.C. 120, 122, 99 F.2d 353, 355 (1938).

## III.

■ On February 7, 1969, during the surveillance of Porter and Spears in Greenville, FBI Agent McNamara overheard a portion of a call Spears was making from a telephone booth. The door of the booth was closed, or nearly so, and Spears' back was to the glass door so that

3. We are told the phrase "line" refers to the predicted point spread between teams in athletic contests.

4. For recent interpretations of the *Marron* limitation see Gurleski v. United States, 405 F.2d 253 (5th Cir. 1968); Anglin v. Maryland, 439 F.2d 1342 (4th Cir. 1971).

he was unaware of the listening agent. The agent was standing very near the booth, or at most two to four feet from it, and overheard the conversation unassisted by any amplifying or electronic surveillance equipment. The overheard conversation was not introduced into evidence, nor was it used in the affidavit to obtain the search warrants. Porter and Spears argue that this was an unconstitutional seizure of the conversation within the rationale of Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and that all evidence and testimony developed subsequent to February 7, 1969, must be excluded as a tainted product of the unlawful seizure. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The rationale of *Katz* is that the Fourth Amendment protects as private that which a person reasonably expects will be private. We think a person is not entitled to expect that his conversation in a telephone booth will not be heard and repeated if he speaks loudly enough to be overheard by the human ear (unassisted electronically) of someone standing outside the booth. "The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak." Lopez v. United States, 373 U.S. 427, 465, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963) (dissenting opinion), quoted with approval in Hoffa v. United States, 385 U.S. 293, 303, 87 S.Ct. 408, 414, 17 L.Ed.2d 374 (1966).

Although offered the opportunity to secure the testimony of the agent who actually listened, appellants did not do so and failed to establish the pertinent facts. We do not even know whether the telephone booth door was entirely closed. Whether the listening FBI agent was four feet from the panel wall of the booth or had his ear pressed tightly against it is not clear. Doubtless there is a risk of eavesdropping against which the law affords no protection, but whether pressing the ear up against the particular panel of a telephone booth goes beyond permissible surveillance and is so similar to electronic bugging as to be an invasion of privacy protected by the Fourth Amendment is not presented on this record. Compare Ponce v. Craven, 409 F.2d 621 (9th Cir. 1969); United States v. Llanes, 398 F.2d 880 (2d Cir. 1968).

As for the eavesdropped conversation, the record indicates that the listening agent learned only what he already knew, *i. e.*, that Spears was engaged in a gambling operation. The listening agent could not ascertain from the conversation to whom Spears was talking, nor even where the person was located. Since the overheard conversation did not reveal to the agents anything they did not already know, nor lead them to any evidence helpful to prove what they already knew, the doctrine of *Wong Sun* is clearly inapplicable, and if we assume a violation of *Katz*, there is no tainted material.

### IV.

■ The appellants raise a number of other issues on appeal which require little discussion. Porter and Spears argue that the district court's denial of their motion for a continuance to allow them to examine the material seized from the Greenville trailers, and especially to allow them to have an expert examine a tape recording discovered in one of the trailers of phone conversations of Porter and Spears giving line information and accepting wagers, was error. The appellants have now had time to examine the evidence seized including an opportunity to test the tape recording. Absent a claim that they have discovered something that would materially further their defense, there is no showing that manifest injustice has resulted from an abuse of the district court's discretion in refusing to grant a continuance. See Isaacs v. United States, 159 U.S. 487, 16 S.Ct. 51, 40 L.Ed. 229 (1895).

■ All three of the appellants objected to the admission of the tape recording seized by the FBI from one of the Greenville trailers. Porter and Spears argue that it was outside the scope

of the search warrant and could not have been the subject of a search warrant because it was mere evidence rather than fruits or instrumentalities of the crime. Fuller argues that the tape was made prior to the date of the first alleged overt act in the conspiracy and thus should have been excluded as hearsay as to him. All three argue that no proper foundation was laid as to the conditions of its making and preservation in the same condition from recording to trial.

The language of the description of items to be seized in the Greenville warrant is identical to that in the Birmingham warrant. See Section *II* above. The tape recording was apparently made as a record of bets and is clearly within the description "bookmaking records and wagering paraphernalia." The distinction between mere evidence and fruits or instrumentalities was abolished in Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). The rule limiting the admissibility of hearsay statements of codefendants that Fuller relies on deals with situations where one conspirator has made a statement as to what another conspirator has done or said. The tape recording is not of that kind. There was no claim made that Fuller was involved in any of the activities mentioned on the tape so that the hearsay rule is not relevant. The tape was admissible as proof that Porter and Spears were engaged in gambling activity, a necessary element of Fuller's conspiracy conviction. Appellants' claim that a foundation had to be laid as to the making and preservation of the tape is based on cases where the party making the tape introduces it into evidence. Here the tape was found in Porter and Spears' possession and their voices are identified on it. The FBI agents through whose hands the tape passed testified that it had not been altered and its condition at the time of the trial was identical to that at the time of seizure. This we think was sufficient foundation for its accuracy.

 All three appellants argue that the district court's instruction regarding

their right not to testify focused the jury's attention on their failure to testify thus depriving them of the right. Absent a request not to give the instruction and absent an objection to it once it was given, the instruction was appropriate. United States v. Smith, 392 F.2d 302 (4th Cir. 1968).

 Fuller argues that the evidence was insufficient to sustain his conviction and that the failure to grant his motion for a separate trial was an abuse of the district court's discretion. After examining the record, we conclude that there was sufficient evidence for the jury to find every element beyond a reasonable doubt and that the refusal of the motion for severance was not an abuse of discretion.

For the reasons stated, the judgment of the district court is

Affirmed.

## APPENDIX
### AFFIDAVIT

Before Mildred F. Sprague, U. S. Commissioner for the Northern District of Alabama, Birmingham, Alabama, the undersigned, being duly sworn, deposes and states: That Affiant is a Special Agent of the Federal Bureau of Investigation and has continuously held that position for the past twenty-five years. Affiant has been assigned to the investigation of gambling matters within the jurisdiction of the Federal Bureau of Investigation in the Birmingham area for the past eleven years. During that time, Affiant has been involved in more than 200 separate and distinct gambling investigations and as a result of this experience, Affiant has had the opportunity to examine the records commonly used by bookmakers.

That since July, 1968, confidential informants have spoken to Affiant personally about gambling and bookmaking activities of CLYDE TROULIAS and ARTHUR FULLER and Affiant was in a position to judge the reliability of those informants. On other occasions, confidential informants have provided information about TROULIAS and FULLER

to Special Agents of the Federal Bureau of Investigation in South Carolina, and at that time Affiant personally reviewed the information submitted by the South Carolina FBI and their informants, and from it made a personal judgment as to the informants' past reliability.

That Affiant, based on facts set forth in this affidavit, now has reason to believe, and does believe, that on the premises further described herein known as:

1133 Sherwood Forest Drive, Birmingham, Alabama, located in the Northern District of Alabama, there has been and are now concealed certain property, to-wit: bookmaking records and wagering paraphernalia consisting of, but not limited to, accounting sheets, rundown sheets, betting slips, recap sheets, sports information papers, miscellaneous line notations, line sheets, books of account, checks, money orders, and United States Currency, which property has and is being used in violation of Sections 371, 1084, and 1052 [sic; the proper section is Section 1952] of Title 18, United States Code.

That Affiant, based on his experience in gambling matters, knows that bookmakers who operate interstate by telephone are known to use and have in their possession the paraphernalia described above.

That the premises are further described as:

1133 Sherwood Forest Drive,
Birmingham, Alabama,
a two-story brick residence.

The facts upon which this affidavit is based are as follows:

I. (a) A confidential informant known to me to have furnished reliable information in the past stated "CLYDE TROULIAS was the biggest bookie in the Birmingham area" and that he bets principally on football but also takes bets on basketball and baseball during their respective seasons.

(b) The same confidential informant further stated on or about the same date that CLYDE TROULIAS is presently working with ARTHUR FULLER in the booking operation in the Birmingham area.

(c) One example of the reliable information which this informant has supplied in the past was informing Affiant of known gamblers being in the Birmingham area during a specific weekend. The Affiant checked this information and personally observed the known gamblers previously noted by the informant.

II. (a) In February, 1969, Affiant had occasion to personally telephone Birmingham telephone number 836–5429, which is the residence of ARTHUR FULLER, located at 1133 Sherwood Forest Drive, Birmingham, Alabama, and CLYDE TROULIAS answered the phone.

(b) On February 27, 1969, Affiant personally telephoned number 322–6192 the telephone number of the sister of CLYDE TROULIAS, and a female answered the telephone, and when Affiant asked to speak to CLYDE TROULIAS, without giving his identity, he was informed that TROULIAS was not there but if desired he could call ARTHUR FULLER.

(c) For the past two years, Affiant has personally observed CLYDE TROULIAS in company with other known gamblers in the Birmingham area. He has also personally observed ARTHUR FULLER during the same period of time in the company of known gamblers in the Birmingham area.

(d) FBI Identification Record No. 418 273 A for CLYDE TROULIAS indicates a gambling conviction in 1960; and a bookmaking arrest in 1967 which arrest occurred after a State raid on the residence of his sister, ANNIE LOU TROULIAS, 2405–36th Avenue North, Birmingham, Alabama.

III. Attached herein is an affidavit of WILLIAM P. HAAS concerning gambling activities in Charleston and Greenville, South Carolina.

In November, 1968, the Affiant received information that an interstate gambling investigation being conducted by WILLIAM P. HAAS, a Special Agent

of the Federal Bureau of Investigation, had disclosed that known gamblers in the Greenville, South Carolina, area had been contacting individuals in the Birmingham, Alabama, area. Special Agent HAAS has been with the FBI continuously for the past six years and has been assigned to the investigation of gambling matters within the jurisdiction of the Federal Bureau of Investigation for approximately three years. Special Agent HAAS furnished Affiant with the following information:

(a) In November, 1968, a confidential informant known to Special Agent WILLIAM P. HAAS to have furnished reliable information in the past, stated that THOMAS LYNN PORTER and LARRY SPEARS were operating a bookmaking establishment in two trailers located on the outskirts of Greenville, South Carolina.

(b) The same confidential informant, who had personally been in the aforementioned trailers, had witnessed THOMAS LYNN PORTER and LARRY SPEARS accepting wagers and giving out line information.

(c) In February, 1969, the same confidential informant stated that PORTER and SPEARS were receiving their line information from Birmingham, Alabama.

(d) Physical surveillance of LARRY SPEARS and THOMAS LYNN PORTER in Greenville, South Carolina, during November, 1968, through and including February 13, 1969, by WILLIAM HAAS and other Special Agents of the Federal Bureau of Investigation placed LARRY SPEARS and THOMAS LYNN PORTER in different telephone booths when the following telephone calls were made:

| Date | Telephone Booth Number | Number Called |
|---|---|---|
| November 7, 1968 | 277–9813 | 322–6192, Birmingham, Ala. |
| November 26, 1968 | 277–9900 | 322–6192, " " |
| November 26, 1968 | 277–9874 | 322–6192, " " |
| December 10, 1968 | 277–9900 | 322–6192, " " |
| January 29, 1969 | 277–9900 | 836–3500, " " |
| February 6, 1969 | 277–9727 | 836–5429, " " |
| February 7, 1969 | 277–9902 | 836–3500, " " |
| February 7, 1969 | 277–9900 | 836–5429, " " |
| February 13, 1969 | 277–9927 | 836–5429, " " |

IV. A survey of the subpoenaed telephone records of Southern Bell Telephone and Telegraph Company of Greenville, South Carolina, disclosed the following calls made from the pay stations mentioned in III(d) above:

| Telephone Number | Call To | Subscriber | Number of Calls | Date |
|---|---|---|---|---|
| 277–9727 | 323–3933 | TROULIAS | 37 | 8/18/68–1/19/69 |
| 277–9727 | 322–6192 | TROULIAS | 65 | 9/29/68–1/19/69 |
| 277–9727 | 836–3500 | FULLER | 10 | 1/18/69–2/21/69 |
| 277–9727 | 836–5429 | FULLER | 7 | 1/22/69–2/21/69 |
| 277–9874 | 323–3933 | TROULIAS | 2 | 12/21/68–1/11/69 |
| 277–9874 | 322–6192 | TROULIAS | 10 | 11/23/68–1/11/69 |
| 277–9874 | 836–5429 | FULLER | 5 | 1/25/69–2/19/69 |
| 277–9874 | 836–3500 | FULLER | 1 | 1/26/69 |
| 277–9902 | 323–3933 | TROULIAS | 10 | 8/22/68–1/10/69 |
| 277–9902 | 322–6192 | TROULIAS | 25 | 8/23/68–1/20/69 |
| 277–9902 | 836–5429 | FULLER | 5 | 1/20/69–2/22/69 |
| 277–9902 | 836–3500 | FULLER | 12 | 1/20/69–2/22/69 |
| 277–9900 | 323–3933 | TROULIAS | 23 | 11/3/68–1/18/69 |
| 277–9900 | 322–6192 | TROULIAS | 33 | 11/2/68–1/19/69 |
| 277–9900 | 836–5429 | FULLER | 4 | 1/16/69–2/15/69 |
| 277–9900 | 836–3500 | FULLER | 10 | 1/20/69–2/15/69 |
| 277–9813 | 323–3933 | TROULIAS | 11 | 11/16/68–1/15/69 |
| 277–9813 | 322–6192 | TROULIAS | 43 | 11/6/68–1/18/69 |
| 277–9813 | 836–5429 | FULLER | 10 | 1/20/69–2/15/69 |
| 277–9813 | 836–3500 | FULLER | 11 | 1/20/69–2/19/69 |

V. Telephone records of South Central Bell Telephone Company, Birmingham, Alabama, reflect that the telephone numbers 322–6192 and 323–3933 are listed to ANNIE LOU TROULIAS, sister of CLYDE TROULIAS, at 2405–36th Avenue North, Birmingham, Alabama; and 836–5429 is subscribed to an ARTHUR U. FULLER, 1133 Sherwood Forest Drive, Birmingham, Alabama, and 836–3500 is listed to WANDA FULLER, wife of ARTHUR FULLER, 1133 Sherwood Forest Drive, Birmingham, Alabama.

VI. The telephone records, shown in paragraph IV (above), indicate there were approximately 259 calls to the residence of CLYDE TROULIAS' sister between August, 1968, through and including January 20, 1969, and seventy-five (75) calls to ARTHUR FULLER'S residence from January 18, 1969, through and including February 22, 1969.

VII. In February, 1969, the Affiant through investigative efforts and toll records from Greenville, South Carolina showing a change of calls leading him to believe that CLYDE TROULIAS had moved his gambling operation from 2405 36th Avenue North, Birmingham, Alabama, the residence of his sister, Mrs. ANNIE LOU TROULIAS, to 1133 Sherwood Forest Drive, Birmingham, Alabama, the residenec of ARTHUR FULLER. The move took place around January 19, 1969.

VIII. An analysis of the Telephone Company toll records obtained pursuant to a Grand Jury subpoena from the Southern Bell Telephone and Telegraph Company of Greenville, South Carolina, reveals generally a pattern of telephonic contacts which can be interpreted as indicative of a gambling enterprise. Affiant, based on his experience investigating interstate bookmaking, knows it is common practice for bookmakers not to use their own telephone number when making interstate calls, and it is common practice to use pay phones not listed to them personally.

IX. Records of Greenville, South Carolina, Police Department indicate THOMAS LYNN PORTER has been arrested in 1959, 1960 and 1961 for selling lottery tickets. In 1967, PORTER was convicted of a gambling offense which he is presently appealing to the United States Supreme Court.

Therefore, Affiant has reason to believe, that the divers bookmaking records and wagering paraphernalia are being used by CLYDE TROULIAS and ARTHUR FULLER, and other persons unknown to Affiant, all of whom are engaged in the bookmaking business, all of whom transmit bets and wagers and information assisting in the placing of bets and wagers in interstate commerce, in violation of Section 1084, Title 18, United States Code, all of whom use facilities in interstate commerce to carry on a business enterprise involving gambling violations contrary to the laws of the State of Alabama in violation of Section 1952, Title 18, United States Code, and all of whom have conspired among themselves and with others to violate Sections 1084 and 1952 in violation of Section 371 of Title 18, United States Code.

Further Affiant saith not.