**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Doyle D. KING (86–5646), Kenneth H. Colliver (86–5647), John M. Poppas (86–5648), Robert Allen Johnson (86–5672), and Dallas Howard Barnett (86–5674), Defendants–Appellants.**

Nos. 86–5646/5647/5648/5672/5674.

United States Court of Appeals, Sixth Circuit.

Argued April 14, 1987.

Decided Nov. 25, 1987.

Rehearing Denied Feb. 4, 1988.

William R. Garmer (argued), Savage, Garmer and Elliott, Lexington, Ky., for Doyle D. King.

Louis DeFalaise, U.S. Atty., Robert Rawlins (argued), Asst. U.S. Atty., Lexington, Ky., for plaintiff-appellee.

James A. Shuffett (argued), Lexington, Ky., for Kenneth H. Colliver.

David R. Irvin (argued), Bulleit, Kinkead, Irvin, Reinhardt, Lexington, Ky., for John M. Poppas.

Blake Page (argued), Winchester, Ky., for Robert Allen Johnson.

R. Burl McCoy, Michael D. Baker, John K. West (argued), Lexington, Ky., for Dallas Howard Barnett.

Before MARTIN, WELLFORD and MILBURN, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

Doyle King, Kenneth Colliver, John Poppas, Robert Johnson, and Dallas Barnett challenge their convictions for operating an illegal gambling business involving five or more people in violation of 18 U.S.C. § 1955.[1] They argue that the district court erred in instructing the jury that one contact between a layoff man[2] and a gambling operation is sufficient to include the layoff man within the five persons required by 18 U.S.C. § 1955(b)(1)(ii). We agree and consequently reverse for a new trial.

On March 15, 1985, at the height of two national college basketball tournaments, federal agents and local police executed "no-knock" search warrants at a number of places in central Kentucky. The places searched included John Poppas' home, Dallas Barnett and Robert Johnson's liquor store, and Kenneth Colliver's home and automobile. In these and other searches, the government collected a substantial amount of gambling-related material.

Indictments for violations of federal anti-gambling laws were brought against eleven people, some of whom pled guilty. After a winnowing of charges and defendants, the trial proceeded against nine defendants on only one count, conducting an illegal gambling business in violation of 18 U.S.C. § 1955. That statute makes it a federal crime for five or more people to conduct a gambling business in violation of state law. At trial, the government argued to the jury that the defendants exchanged line information and layoff bets. Because of these mutually-advantageous and interlocking relationships, the government contended, the nominally-independent defendants could be counted together as operating a single, integrated illegal gambling business.

At the end of the trial, the district court instructed the jury on the application of 18 U.S.C. § 1955 to layoff men.[3] It said, "One

---

1. 18 U.S.C. § 1955 provides:
   (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.
   (b) As used in this section—
   (1) "illegal gambling business" means a gambling business which—
   (i) is a violation of the law of a State or political subdivision in which it is conducted;
   (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
   (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day....

2. In a typical gambling operation, the bookmaker makes his profit by charging a bookmaker's commission, rather than by winning the bets themselves. Ideally, the bookmaker has equal amounts bet on each side of a contest so that the losing bettors, in effect, pay the winners, and the bookmaker keeps his commission. "Lay off" betting is one way in which a bookmaker can insure that bets on an event will be relatively balanced. A bookmaker with an unbalanced book can reduce his risk of loss by transferring, or "laying off," excess bets to a third person, or "layoff man." For a short dictionary of gamblers' terms, *see United States v. Thomas*, 508 F.2d 1200, 1202 n. 2 (8th Cir.), *cert.*

*denied*, 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 100 (1975).

3. In instructing the jury on the meaning of 18 U.S.C. § 1955, the district court began by explaining that "conduct" is a broad term and "would include any working in the business enterprise...." The court then emphasized, "Now, remember, a mere bettor or a customer, however, would not be participating in the conduct of the business." The district court subsequently turned to the significance of layoffs and line information:

> A person who accepts layoff bets from a bookmaking enterprise, or a person who supplies line information to a bookmaking enterprise, therefore performs a function helpful in operating the bookmaking enterprise, and, therefore, conducts said enterprise, may be counted as one of the five or more participants necessary under Section 1955.

> Bets between bookmakers may be personal wagers that are not layoff bets. In instances, however, where a bet is a layoff, then a layoff man is not a bettor but a bet receiver. By accepting over-bets, the layoff man becomes not only a bookmaker but the bookie's insurer and is, therefore, important to a gambling operation. The layoff man need not be in contact regularly to perform his insuring function. He must only be available on the day a bookmaker over-bets and wishes to reduce his financial risk by laying off.

contact is enough for a layoff man to become a bookmaker, and, thus, one of the five persons involved in the business." The defendants objected and requested an instruction requiring the jury to determine that the acceptance of layoffs must "substantially affect" the bookmaker's business for the person taking the layoffs to be counted as one of the five persons involved in the business.

One defendant was acquitted, and the jury found the eight before them guilty of operating an illegal gambling business in violation of 18 U.S.C. § 1955. Five of the convicted defendants, King, Colliver, Poppas, Johnson, and Barnett, now appeal. Each has raised a number of claims and has adopted those of the others. Colliver, Poppas, and Barnett reassert the objection to the jury instructions. Colliver complains that the admission of wagering records violated his constitutional and statutory rights against self-incrimination, and King challenges the admission of some tape recordings. The other claims do not merit mentioning.

Because 18 U.S.C. § 1955 does not explicitly refer to layoff men, the defendants' objection to the "one contact" jury instruction raises the significant issue of how layoff men should be treated under the federal anti-gambling business statute. In order to lend some perspective to this issue, we briefly review the history of gambling laws in America.[4]

Throughout our history, the regulation of gambling has been largely left to the state legislatures, which have, in turn, treated gambling with ambivalence. Before the Revolution, gambling was not regarded as a crime. Each of the thirteen colonies, at one time or another, had lotteries and permitted other forms of gambling. There were, of course, early efforts to suppress gambling, but these anti-gambling enactments and prosecutions were sporadic and were usually directed more at the threats to public welfare that attended gambling than at gambling itself.

The general tolerance of gambling continued into the nineteenth century. Many states ran lotteries to raise money, and unlicensed lotteries prospered. Some of these lotteries became mired in scandal, with the corruption of public officials and the disappearance of proprieters with the prizes. Public outcry produced a spate of state enactments prohibiting lotteries, the first appearing in the 1830's. After the Civil War, however, Southern states began to turn to lotteries again as painless means of raising desperately-needed revenue. In the late nineteenth century there was a new series of scandals, most notably those surrounding the Louisiana State Lottery. The ensuing public outrage was so great that even Congress legislated on gambling. In 1890, Congress forbade the use of the postal service for the carriage of lottery paraphernalia. See Act of Sept. 19, 1890, ch. 908, § 1, 26 Stat. 465 (codified as amended at 18 U.S.C. § 1302). Five years later, Congress extended the ban to all interstate commerce with the Federal Lottery Act, the first use of the commerce clause in an area of state and local police power. See Act of Mar. 2, 1895, ch. 191, § 1, 28 Stat. 963 (codified as amended at 18 U.S.C. § 1301). After this brief foray into the field of gambling legislation, Congress resumed its hands-off approach to gambling.

During the next half century, the nature of the organizations promoting illegal gambling changed dramatically. Before the 1920's, these organizations, although corrupt, did not typically participate in a pano-

One contact is enough for a layoff man to become a bookmaker, and, thus, one of the five persons involved in the business.

I have said that a mere customer cannot be said to conduct a gambling business which he patronizes. If, however, you find beyond a reasonable doubt that the Defendant is a bookmaker and that he regularly exchanges line information or places or accepts layoff bets with another bookmaker, you may consider that Defendant as conducting, financing, managing, directing or owning all or part of the gambling business of the other bookmaker.

4. For historical treatments of gambling law, see R. King, *Gambling and Organized Crime* (1969); Blakey & Kurland, *The Development of the Federal Law of Gambling*, 63 Cornell L.Rev. 923 (1978).

ply of criminal ventures nor indulge in violent crime. But Prohibition introduced a new phenomenon: the crime syndicate. Syndicates got their start with bootlegging, and they quickly expanded their activities to other forbidden areas. Although illegal gambling might not have created the gangster, "it proved to be an activity well suited for him to take over and develop, along with the extortion, prostitution, organized pilfering, fencing, etc. The speakeasy and the hoodlum-guarded roadhouse casino soon prospered together, both often protected by the same 'muscle' and immunized from official harassment by some 'arrangements.' " R. King, *Gambling and Organized Crime* 24 (1969). With the repeal of the eighteenth amendment, organized crime was stripped of one of its most fruitful enterprises. Although some bootleggers made the transition to the legal production of alcohol, organized crime was left with gambling as its largest source of income.

In the 1950's and 60's, organized crime became the subject of much official concern, with investigations by congressional committees and presidential commissions. These investigations revealed that organized crime had spun an expansive network of corruption that entangled local, state, and even federal officials. The investigations also pointed to illegal gambling as the font of organized crime's growing wealth. As a result, these committees and commissions proposed federal legislation designed to undermine organized crime's power. It was in this atmosphere that Congress drafted the Organized Crime Control Act of 1970, of which section 1955 is a part.

As the legislative history of section 1955 reveals, Congress passed this law in an attempt to attack sophisticated, large-scale illegal gambling operations which Congress thought to be a major source of income for organized crime. *See* 114 Cong.Rec. 15,603 (1968) (remarks of Sen. McClellan upon introducing a predecessor of 18 U.S.C. § 1955) ("Gambling is the principle source of income for the elements of organized crime and it is the purpose of this bill to seek to shut off this flow of revenue by making it a crime to engage in a substantial business enterprise of gambling."); 116 Cong.Rec. 590–91, 603–04 (1970) (remarks of Sens. McClellan and Allot); President's Commission on Law Enforcement & Administration of Justice, *The Challenge of Crime in a Free Society* (1967). The House Judiciary Committee Report on this part of the Crime Control Act explained that the intent

> is not to bring all illegal gambling activity within the control of the Federal Government, but to deal only with illegal gambling activities of major proportions. It is anticipated that cases in which their standards can be met will ordinarily involve business-type gambling operations of considerably greater magnitude than simply meet the minimum definitions. The provisions of this title do not apply to gambling that is sporadic or of insignificant monetary proportions. It is intended to reach only those persons who prey systematically upon our citizens and whose syndicated operations are so continuous and so substantial as to be of national concern....

H.R.Rep. No. 1549, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S.Code Cong. & Admin.News 4007, 4029 [hereinafter "House Report"]. *See also* S.Rep. No. 617, 91st Cong., 1st Sess. 73 (1969) [hereinafter "Senate Report"].

Under the Organized Crime Control Act of 1970, small gambling operations remained the responsibility of the states. Rather than bringing federal power to bear on all illegal gambling, Congress confined federal competence to businesses involving five or more people, and lasting at least thirty days or dealing with $2,000 or more in a single day. Congress was aware, however, that gambling operations are often much larger than can be proved and that law enforcement officials need flexibility in combatting "illegal gambling activities of major proportions." House Report, 1970 U.S. Code Cong. & Admin. News 4029. *See also* Senate Report at 73; 116 Cong. Rec. 603 (1970) (remarks of Sen. Allot).

To permit the government that needed flexibility, the originally-proposed section 1955(b)(1)(ii) defined an "illegal gambling

business" as an operation involving five or more people who "participate" in the gambling. This language was objected to, however, on the grounds it swept too broadly. "The word 'participate,' it was argued, could include even the customers of a gambling business, thereby bringing the federal power to bear against such small scale operations as 'Mom and Pop' bookmaking businesses having two owners and three customers." *United States v. Thomas,* 508 F.2d 1200, 1205 (8th Cir.), *cert. denied,* 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 100 (1975) (*citing* Hearings on S. 30 and related proposals before Subcomm. No. 5 of House Comm. on the Judiciary, 91st Cong., 2d Sess., ser. 27, 325–326 (1970)). *See* 116 Cong.Rec. 589–91 (1970) (remarks of Sen. McClellan). The statute now reads, "conduct, finance, supervise, direct, or own all or part...." 18 U.S.C. § 1955(b)(1)(ii). The term "conduct" was chosen in order to reach both "high level bosses and street level employees," but not bettors. House Report, 1970 U.S. Code Cong. & Admin. News 4029. "Conduct," explained the House Report, "does not include the player in an illegal game of chance, nor the person who participates in the illegal gambling activity by placing a bet." *Id.*

We have sought to give more precise meaning to this inclusive statute, and the prevailing rule is that a person "conducts" a gambling business if he either performs any act which is necessary to the operation of the gambling enterprise or regularly engages in conduct which is helpful to the enterprise. *United States v. Merrell,* 701 F.2d 53, 55 (6th Cir.), *cert. denied,* 463 U.S. 1230, 103 S.Ct. 3558, 77 L.Ed.2d 1415 (1983). Under certain circumstances, a layoff man can clearly fit this formulation. For instance, a layoff man who regularly accepts a substantial amount of excess wagers performs a service that is essential to the profitable running of a gambling operations. *See United States v. Grezo,* 566 F.2d 854, 858–59 (2d Cir.1977).

The crucial question remains how little contact between a layoff man and a bookmaking operation need be demonstrated for him to be found to have conducted the gambling business and be counted in the statute's jurisdictional five. The majority of the Courts of Appeals that have considered the issue have required proof of regular contacts. *See, e.g., Grezo,* 566 F.2d at 859 (2d Cir.1977) (approving jury instructions that stated, "[t]he word 'conduct' ... does not include anyone, including an outside or independent bookmaker who places a single, or isolated bet for his own customer, or who makes isolated and casual, rather than substantial and regular lay-off bets, or who occasionally exchanges line information with the central gambling operation"); *United States v. Avarello,* 592 F.2d 1339, 1347 n. 11 (5th Cir.) (approving jury instructions that stated, "it is only when there is a consistent and regular pattern of accepting or placing lay-off bets between bookmakers that one bookmaker can be said to conduct or finance the business of the other bookmaker"), *cert. denied,* 444 U.S. 844, 100 S.Ct. 87, 62 L.Ed.2d 57 (1979); *United States v. Box,* 530 F.2d 1258, 1266 (5th Cir.1976) (a layoff man cannot be convicted under section 1955 unless there is evidence that he provided a regular market for layoff bets or otherwise was an integral part of the bookmaking business); *United States v. Turzitti,* 547 F.2d 1003, 1005–06 (7th Cir.) (following *Box*), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1653, 52 L.Ed.2d 361 (1977); *Thomas,* 508 F.2d at 1206 (8th Cir.1975) ("[I]solated and casual lay off bets and an occasional exchange of line information may not be sufficient to establish that one bookmaker is conducting or financing the business of a second bookmaker."); *United States v. Hawthorne,* 626 F.2d 87, 91–92 (9th Cir.1980) (following *Thomas*). *See also United States v. Campion,* 560 F.2d 751, 754 (6th Cir.1977) ("Nothing in the record suggests that Campion's involvement had a significant or substantial impact upon the gambling enterprise."). *But see United States v. Jenkins,* 649 F.2d 273, 275 (4th Cir.1981) (adopting a "one contact" rule).

■ We think a fair interpretation of section 1955 requires the "regular contacts" standard as opposed to the "one contact" rule. In our view, the "one contact" rule violates the long-established judi-

cial policy of interpreting criminal statutes narrowly, strains the meaning of "conducts," and misconstrues the purpose of the statute. Through section 1955, Congress wanted to attack what it perceived as a major source of money for organized crime without encroaching upon the states' traditional jurisdiction over small gambling operations. Given this Congressional intention, the statute should not be construed to encompass a one-time participant. If we were to adopt the "one contact" approach, two local, "Mom and Pop" operations, one of two people and the other of three, that on one occasion placed layoffs with each other could be subjected to federal authority. This would be an unwarranted expansion into local matters of a federal law aimed at national concerns. Congress sought to protect state responsibility in matters local in nature, and it would be inappropriate for us to permit the expansion of federal power into those state preserves.

We consequently agree with Colliver, Poppas, and Barnett that the "one contact" instructions stretches the reach of section 1955. Proof of one layoff, by itself, does not establish that a person conducted the business of a bookmaker. Although the substantial amount of evidence offered by the government might well have been sufficient to meet the "regular contacts" standard, we cannot know from the verdict whether the jury based its verdict on a finding of only one contact as to some of the defendants. In view of this uncertainty, we must conclude that the instructions were in error.

■ Although this flaw in the jury instructions requires reversal, the defendants' contentions reveal no other errors. Colliver claims that the admission into evidence of his betting records violated his fifth amendment right against self-incrimination and the protections created in 26 U.S.C. § 4424(c). He argues that tax code provision 26 U.S.C. § 4403 required him to keep these betting records, and, because he was compelled to keep these records, their use against him in this criminal case violated his fifth amendment privilege against self-incrimination. Their use also, accord-

ing to Colliver, violated 26 U.S.C. § 4424(c), which forbids the use in a non-tax case of any material possessed by the taxpayer that he maintained to comply with the tax code's record-keeping requirement for wagering businesses. We disagree. The betting sheets admitted into evidence bore little resemblance or connection to those records maintained for the Internal Revenue Service. The evidence indicates that he kept substantially understated and incomplete records for tax purposes, and it is patently apparent that the betting sheets were kept solely for the business purpose of keeping track of his many bets. These betting sheets were not kept to comply with record-keeping requirements. When the government discovers such freely-prepared documents, the existence of a statute coincidentally requiring their maintenance does not transform the voluntary admissions into coerced incrimination. *See Andresen v. Maryland*, 427 U.S. 463, 470–77, 96 S.Ct. 2737, 2743–47, 49 L.Ed.2d 627 (1976). *See also United States v. Brian*, 507 F.Supp. 761, 768–69 (D.R.I.1981), *aff'd sub nom. United States v. Southard*, 700 F.2d 1 (1st Cir.1983), *cert. denied*, 464 U.S. 823, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

■ King attacks the admission into evidence of a tape recording that had been made by some of the defendants as a record of bets in order to settle disagreements with bettors. King's claim that a foundation had to be laid as to the making and preservation of the tape is based on cases where the party making the tape introduces it into evidence. These tape recordings were found at one of the bookmaking operation sites, and the government agent who discovered the recordings testified that they were in the same condition as at the time of seizure. We think this foundation is sufficient to assure the accuracy of the recordings. *See United States v. Fuller*, 441 F.2d 755, 762 (4th Cir.), *cert. denied*, 404 U.S. 830, 92 S.Ct. 74, 30 L.Ed.2d 59 (1971).

The judgment of the district court is reversed and the defendants granted a new trial.