RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0293P (6th Cir.)
File Name: 01a0293p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
     *Plaintiff-Appellee,*

     *v.*

No. 99-4349

ROBERT MICK,
     *Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 99-00126—James S. Gwin, District Judge.

Argued: May 4, 2001

Decided and Filed: August 29, 2001

Before: SILER and GILMAN, Circuit Judges; DUGGAN,
District Judge.

---

## COUNSEL

**ARGUED:** Paul F. Adamson, BURDON & MERLITTI,
Akron, Ohio, for Appellant. Robert E. Bulford, ASSISTANT
UNITED STATES ATTORNEY, Akron, Ohio, for Appellee.

---

[*]The Honorable Patrick J. Duggan, United States District Judge for
the Eastern District of Michigan, sitting by designation.

1

**ON BRIEF:** Paul F. Adamson, BURDON & MERLITTI, Akron, Ohio, for Appellant. Robert E. Bulford, ASSISTANT UNITED STATES ATTORNEY, Akron, Ohio, for Appellee.

———————————

## OPINION

———————————

RONALD LEE GILMAN, Circuit Judge. Robert Mick was convicted on one count of conducting an illegal gambling business, in violation of 18 U.S.C. § 1955, one count of using a facility of interstate commerce for illegal purposes, in violation of 18 U.S.C. § 1952(a)(3), fifty-nine counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), and eleven counts of knowingly engaging in monetary transactions using criminally derived property worth more than $10,000, in violation of 18 U.S.C. § 1957. He was subsequently sentenced to spend 57 months in prison, serve 36 months of supervised release, and pay $7,100 as a special assessment. In this appeal of his conviction and sentence, Mick challenges the issuance of a search warrant covering his house and trailer, the admission of evidence discovered as a result of the search, the admission of his tax returns and gambling records at trial, the sufficiency of the evidence relating to the illegal gambling business conviction, and several sentencing issues. For the reasons set forth below, we **AFFIRM** Mick's conviction and sentence.

## I. BACKGROUND

### A. Factual background

Robert Mick is an admitted bookmaker who resided on Westwood Street in Alliance, Ohio. According to the testimony of Mick's girlfriend, Harriet Brodzinski, Mick had been a bookmaker since at least the time that they started dating in 1984. Bookmaking in fact provided the sole source of their income since the late 1980s, when Mick sold a bar that he had owned. Up until May of 1997, he ran his bookmaking business out of a trailer located at 1505 East

court employing the Sentencing Guidelines).  Accordingly, we affirm the district court's enhancement of Mick's offense level pursuant to § 3B1.1.

**H.  The district court's failure to downward depart in determining Mick's sentence is not reviewable on appeal**

Mick's final claim on appeal is that the district court erred in not downwardly departing from the range provided for in the Sentencing Guidelines.  As the government points out, however, this is not an appealable decision unless the district court did not believe that it had the discretion to do so.  *See United States v. Prince*, 214 F.3d 740, 766 (6th Cir. 2000).  This court in *Prince* set forth our standard of review as follows:

> We examine the sentencing hearing transcript to determine whether the district court's refusal to depart downward was an exercise of discretion or a legal determination that it lacked the authority to depart. . . . The district court judge has no duty to state affirmatively that he knows he possesses the power to depart downward but declines to do so.

*Id*.  After reviewing the sentencing hearing transcript, we find no indication that the district court believed itself to lack the discretion to depart downward.  We are therefore without jurisdiction to review this claim of error.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** Mick's conviction and sentence.

State Street in Alliance.  The trailer had several telephone lines, all of which were listed in Brodzinski's name.  At least one of these lines was used to support a facsimile machine.  During the period between March 20, 1997 and May 18, 1997, the FBI, pursuant to a court order, ran a pen register on each of these lines.  Based on this surveillance, the register traced over 3,400 telephone calls on the facsimile machine (98% were outgoing calls), 4,000 calls on one telephone line, and over 2,400 calls on the third (90% of the telephone calls were incoming).

The two-month sampling of Mick's telephone activity in his trailer indicated that he was sending out more than 50 transmissions on his fax machine each day, and receiving over 100 daily telephone calls, most of which were of a short duration.  In an attempt to maximize the bettors who would utilize his bookmaking service, Mick had Cheryl Stoiber, a friend from Louisville, Kentucky, who knew that Mick was a bookmaker, maintain an extra telephone line in her home.  Mick placed a call-forwarding service on this line, which allowed bettors from Louisville to make a local telephone call that would be automatically patched through to his trailer in Alliance.  Stoiber received no compensation for allowing this line to remain in her house, but Mick paid for the line by having Brodzinski periodically send her $200 checks, which Stoiber would use to pay each telephone bill.  When the money would run out, she would call Mick, who would then send another check in the mail.

Brodzinski testified that she and Mick would answer the telephones each day and write down bets that were being placed by various customers.  Although Brodzinski and Mick usually answered the telephone themselves, Mick's two sons, Robert and Shawn, also took calls from bettors at various times. Each bet was eventually entered into their computer, after which the handwritten records would be shredded.  Bets could be placed on any major sporting event, particularly football, baseball, and basketball.  There were two types of people who would call in bets: individual bettors and bookmakers.  Both would place bets for themselves, but the

latter also placed what are known as "layoff bets." A layoff bet is made when a bookmaker has received various bets on a particular sporting event that cumulatively favors one of the participants. The bookmaker would then call Mick and bet for the team that had less bets placed by his clients, thus balancing out or "laying off" his risk.

At any given time, Mick had between 30 and 40 individual bettor clients and at least 9 bookmaker clients. Brodzinski named approximately 9 customers who regularly called in layoff bets, but it is unclear how she knew that they were actually bookmakers. Although she stated that she knew a layoff bet was being placed because "usually it was a bigger bet than a bettor would make," and because of the characteristic time of the telephone call, she later admitted that, other than Mick's statements to her about who was a bookmaker, she had seen no evidence indicating that they were bookmakers laying off bets.

Based on the testimony of Brodzinski and several of the bookmakers, the government painted a picture at trial of an intricate gambling business, of which Mick and his trailer were at the epicenter. Mick paid $5,000 a year to receive a line service from Don Best Sports, which provided up-to-the-minute information on odds, statistics, game information, and other details of interest to those who bet on sporting events. Indeed, with his line service and the multiple telephone calls from bettors and bookmakers requesting line information and placing bets, the government established that Mick was at the center of a "continuous stream of information."

Mick's gambling enterprise stretched into the community beyond his trailer and telephone lines. During the football season, for example, Mick would prepare "parlay slips" (weekly schedules of games and point spreads) and have them distributed to interested customers of the M&M Sports Club in Sebring, Ohio, a bar owned by Donald Campbell. Each customer would have to pay for the parlay slips, from which Campbell received a cut.

**G. The district court did not err when it enhanced Mick's offense level for playing a major role in the money-laundering offenses**

Section 3B1.1 of the Sentencing Guidelines permits an increase in the offense level if "the defendant was an organizer, leader, manager, or supervisor in any criminal activity." In *United States v. Garcia*, 19 F.3d 1123, 1125 (6th Cir. 1994), this court detailed the considerations that a district court should take into account when deciding whether to enhance a sentence pursuant to § 3B1.1. These considerations include the exercise of decision-making authority and the degree of control exercised over others. *See id*. Mick challenges the application of this guideline to the money-laundering convictions because "there is insufficient evidence to define any specific role regarding the[] bank accounts or the deposits/withdrawals." He argues that "the evidence at trial was unclear as to who wrote the checks and who mailed them."

The district court nevertheless found that

there was more than abundant evidence that the nature of your participation was as the leader and the organizer of this enterprise, that you exercised the decision-making authority over this, that you determined the distribution of the fruits of this crime, that your level of participation in planning and organizing this offense was far and away predominant over others, including Ms. Brodzinski, and that this was true for both the money laundering going into bank accounts where the Court credits the testimony that you directed how the checks and the monies were to be attributed, and as to the distribution of that money, wherein the Court finds that you, again, exercised control over that.

Because Mick has not produced any evidence to show that this finding of fact was clearly erroneous, we have no basis to disturb the district court's enhancement. *See United States v. Jones*, 159 F.3d 969, 980 (6th Cir. 1998) (applying a clearly erroneous standard of review to factual findings of a district

109, 113-14 (6th Cir. 1987). Because the jury instructions as given properly described the rule as laid out in *King*, the district court did not err in prohibiting the consideration of those who regularly received line information from Mick as being part of the jurisdictional five. We therefore affirm the district court's rejection of Mick's proposed jury instruction.

**F. The district court did not err in refusing to downwardly depart based on the acceptance of responsibility**

Mick next challenges the decision of the district court not to downwardly depart from his offense level pursuant to § 3E1.1 of the United States Sentencing Guidelines, which permits a two-point reduction if "the defendant clearly demonstrates acceptance of responsibility for his offense." In its decision not to downwardly depart pursuant to § 3E1.1, the district court found that Mick "did not come forward truthfully and admit the elements of the offense, and that more than a technical matter was involved in the denial."

Although Mick admitted to gambling in violation of Ohio law, he persisted in denying that he satisfied all of the elements of 18 U.S.C. § 1955, particularly the five-person jurisdictional requirement. Application Note 2 to § 3E1.1 provides in pertinent part that

> [t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse.

Because Mick put the government to its burden of proof in establishing the elements of an "illegal gambling business," the district court correctly concluded that Mick failed to "clearly demonstrate acceptance of responsibility for his offense." Accordingly, we affirm the district court's decision not to downwardly depart.

Another of Mick's friends, Vernon Thomas, was the owner of B.J.'s Car Wash in Alliance. Thomas was one of Mick's regular bettors, and he placed his bets from BJ's on a daily basis. He and a group of other bettors would often convene in the backroom of the car wash to place bets with Mick, as well as receive line information from him. At one point, Mick even gave Thomas a facsimile machine, which Thomas and his friends used to place their bets.

In February of 1995, the Stark County Sheriff's Office and the Canton branch of the state police began investigating reports that they had received regarding Mick's gambling enterprise. For several years, the Canton Criminal Intelligence Unit, and eventually the FBI, performed spot checks and surveillance of Mick's activities. Based on the surveillance summaries for the days when Mick was being observed, his typical pattern was to leave his home, go directly to his trailer, and then drive around Alliance and Sebring visiting various locations, including the M&M Sports Club and BJ's Car Wash. On at least two occasions, men were observed leaving M&M counting money at the same time that Mick was inside. Officers also examined M&M's trash, where they discovered parlay sheets and betting slips.

On May 27, 1997, Michael Mihok, a special agent with the FBI, prepared an affidavit in support of a request for a warrant to search Mick's house, trailer, and safety deposit box. The affidavit contained information provided by three confidential informants. According to the affidavit, "Source 1" informed Mihok that Mick was operating a gambling business out of his trailer, which included six bookmakers who worked for Mick, as well as Mick's sons and girlfriend. Source 1 also told Mihok that Mick was providing line information to other bookmakers and distributing parlay sheets around the county. Finally, Source 1 said that Mick had a line service and a computer on which Mick kept his records.

The second informant, "Source 2," also told Mihok that Mick was a bookmaker and was delivering parlay sheets out of his trailer. Source 2, like Source 1, stated that Mick had a

line service in his trailer, which Mick used to provide information to "most of the bookmakers in Stark County." With respect to the reliability of these two sources, Mihok's affidavit only said that they had both "proven to provide accurate information in the past."

According to Mihok's affidavit, the third informant, Cooperating Witness 1 (CW 1), had "direct knowledge" of Mick's bookmaking activity. Mihok's basis for claiming that CW 1 was a reliable witness was that

CW 1 is not a member of the criminal element and has never been involved in any criminal activity. CW 1 has not provided information to any law enforcement agency in the past as CW 1 has had no involvement with law enforcement. CW 1 has had a steady job for over 11 years and is a model citizen. CW 1's only motive to provide this investigation [sic] is to assist law enforcement in this investigation.

According to the affidavit, CW 1 was at BJ's Car Wash when a friend of his engaged in betting with Thomas. Although CW 1 did not witness the actual transaction, his friend filled him in on all of the details, including the statement that Thomas "was one of Mick's bookmakers." CW1's friend further told him that Thomas had a wagering log, that some of his bettors were police officers, and that the bookmaking enterprise was run out of a trailer.

The affidavit also included information beyond that provided by these three informants. A detailed description of the results from the pen register was provided. The results of the surveillance were set forth, detailing Mick's travels between his home, the trailer, the sports bar, and the car wash. According to the affidavit, "[s]urveillances at [M&M] revealed Mick was meeting with approximately seven to ten people [and] . . . was observed carrying items into the location and his associates were observed coming out of this location, counting money in their hands." The affidavit also described the examination of M&M's trash. Agent Mihok summarized Mick's visits to BJ's Car Wash, his meetings with "known

Our standard of review in challenges to the district court's denial of a proposed instruction is as follows:

We review jury instructions as a whole to determine whether they fairly and adequately submitted the issues and applicable law to the jury. . . . A district court's refusal to deliver a requested instruction is reversible only if that instruction is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense.

*United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991). Mick offers little argument in support of this claim of error in his brief. Furthermore, the claim lacks merit because the proposed instruction was an incorrect characterization of both the facts and the law. To begin with, there was sufficient evidence to support the jury's conclusion that Mick knew that some of his regular bettors were placing layoff bets. For example, according to Brodzinski, Mick would inform her as to which of their clients were bookmakers. The jury could infer from his knowledge of this information, as well as his control and leadership over the entire enterprise, that he was aware that some of the bets being placed by these bookmakers were layoff bets. Thus, the first portion of these proposed instructions, which suggests that there was no evidence that "Mick had knowledge that the bets he was receiving were 'layoff bets,'" was an incorrect characterization of the facts, and therefore properly denied.

The second portion of the proposed instructions, declaring that a person cannot be considered part of the jurisdictional five if all he was doing is receiving line information, is incorrect on the law. This court has never made such a formalistic rule. Rather, the correct rule, as discussed above, is that any participant in the enterprise may be considered among the requisite five members, so long as his or her dealings with the gambling business are "regular" and not just based on "one contact." *See United States v. King*, 834 F.2d

Based on this court's interpretation of the degree of "conduct" necessary to be counted in the jurisdictional requirement of five participants, there is overwhelming evidence to support the jury's conclusion that § 1955 was satisfied. Mick does not dispute that he, Brodzinski, and at least one of his sons can be counted towards the jurisdictional five. There was also abundant evidence supporting the jury's conclusion that bookmakers such as Frank Birch, Richard Gothot, Andrew Schneider, and Eugene Smith placed regular layoff bets with Mick. Furthermore, Mick's agreements with Campbell (who distributed parlay sheets for Mick) and Stoiber (who allowed Mick to utilize a telephone line out of her house) were sufficiently regular and helpful to his gambling business to permit the jury to count them as well. Indeed, the summary above is actually an incomplete listing of all the people who regularly aided Mick's gambling enterprise. We therefore find no merit in Mick's challenge to the jury's conclusion that his activities constituted an "illegal gambling business" pursuant to 18 U.S.C. § 1955.

### E.   The jury instructions correctly defined the elements of a § 1955 violation

Mick also challenges the district court's denial of his proposed jury instruction, which in part would have informed the jury that because "there is no evidence that Defendant Mick had knowledge that the bets he was receiving were 'layoff bets,' . . . you are instructed that these witnesses cannot be counted among the five persons necessary to constitute a federal gambling offense based solely on their testimony regarding the placement of layoff bets." His proposed instruction also stated that "since there is no evidence that Defendant, Robert Mick, exchanged line information with any of the witnesses although he provided line service to some, you are instructed that a person cannot be counted as one of the five persons necessary to constitute a federal gambling offense solely on the basis of having subscribed to or having received line information from" Mick.

gamblers or bookmakers," and the exchange of documents between Mick and his associates.

Finally, the affidavit contained Agent Mihok's knowledge about the common practices of those who operate gambling businesses. According to Mihok's affidavit, they typically maintain detailed ledgers and records, conceal large amounts of currency in their residences or places of business and, finally, use computer hardware and software to store the data that has been collected throughout their business dealings.

Based on this fifteen-page affidavit, the magistrate judge issued a search warrant for Mick's trailer, home, and safety deposit box. The search conducted pursuant to the warrant yielded vast amounts of money and evidence. In Mick's home on Westwood Avenue, the FBI discovered bank records, gambling records, and almost $550,000 in cash. The search of the trailer yielded more gambling records, as well as computer hardware, telephone equipment, and utility bills. In Mick's safety deposit box, the officers found $127,000 in cash, four silver bars, a gold coin, and a special-print ten-dollar bill.

### B.   Procedural background

On April 21, 1999, Mick was charged in a 72-count indictment. One count alleged the violation of 18 U.S.C. § 1955, which prohibits a person from conducting an illegal gambling business. Another count charged Mick with using a facility of interstate commerce to further a criminal purpose, in violation of 18 U.S.C. § 1952(a)(3). The remaining 70 counts charged Mick with money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) (59 counts), and engaging in monetary transactions in criminally derived property worth more than $10,000, in violation of 18 U.S.C. § 1957 (11 counts).

Mick filed a motion to suppress evidence on June 21, 1999, challenging the fruits of the search detailed above and the introduction of his tax records and returns. Following a suppression hearing, the district court declined to exclude the

evidence procured from the search. On the first day of trial, July 19, 1999, the court denied the remainder of Mick's motion.

At trial, Mick admitted to being a bookmaker. His primary defense was a challenge to the government's evidence on a key element of a § 1955 conviction – the requirement that the gambling business "involve[] five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business." 18 U.S.C. § 1955(b)(1)(ii).

The government's proof focused primarily on the testimony of Brodzinski, Campbell, Stoiber, Thomas, and various other bookmakers, as well as voluminous documentary evidence. After the government rested, Mick renewed his objections and moved for acquittal, all of which were overruled or denied.

Mick called two witnesses in his defense. First, he presented James Ritchie, a tax preparer and former IRS auditor who had been assisting Mick with his tax returns since 1994. Ritchie testified that Mick had complied with the Internal Revenue Code's requirement that an excise tax be paid on all wagers accepted. Second, Mick presented a gambling expert, Michael Cohen, who said that it was impossible to discern from the betting records whether a bet was from an individual bettor or a bookmaker.

On July 21, 1999, the jury returned a guilty verdict on all 72 counts. A presentence investigation report was then prepared, to which Mick filed various objections. He was sentenced on October 26, 1999 to spend 57 months in prison, serve 36 months on supervised release, and pay $7,100 as a special assessment. Mick now appeals his conviction and sentence. Specifically, he challenges the constitutionality of the search warrant and claims that the district court erred when it denied his motion to suppress the fruits of the searches in question. Mick also challenges the admission of certain handwritten business records into evidence, the government's use of his tax returns to impeach Ritchie, the sufficiency of the evidence to support the first count relating to an illegal gambling

"involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business."

Mick misstates this circuit's interpretation of the five-person jurisdictional requirement. He cites *United States v. Murray*, 928 F.2d 1242 (1st Cir. 1991), for the proposition that the government must prove that "at all times during some thirty day period at least five persons were involved in conducting the gambling operation." Mick fails to note, however, that our court has interpreted § 1955(b)(1) differently. In 1974, fifteen years before *Murray*, this court held that "[t]he statute, 18 U.S.C. § 1955(b)(1)(iii) clearly makes the thirty day requirement a part of the definition of illegal gambling business *and not* a specific requirement as to the duration of individual participation by persons involved in such business." *United States v. Mattucci*, 502 F.2d 883, 889 (6th Cir. 1974) (emphasis added). The five-person requirement can therefore be satisfied at any point during the thirty days, regardless of the duration of a person's involvement in the business, so long as his or her participation is either regularly helpful or "necessary to the operation of the gambling enterprise." *United States v. King*, 834 F.2d 109, 113 (6th Cir. 1987).

In considering whether a person's involvement constitutes sufficient "conduct" to be counted as one of the five people required to satisfy § 1955, this court has held that "Congress intended the word conduct to refer to both high level bosses and street level employees." *Mattucci*, 502 F.2d at 888 (counting the doorman in a gambling club as one of the jurisdictional five) (internal quotation marks omitted). The Fifth Circuit has even gone so far as counting a line service, similar to the one provided by Don Best Sports, as one of the jurisdictional five. *See United States v. Heacock*, 31 F.3d 249, 252 (5th Cir. 1994). Most importantly, this court has held that layoff bettors may be considered as part of the requisite five members, so long as their dealings with the gambling business are "regular" and not just based on "one contact." *See King*, 834 F.2d at 113-14.

Furthermore, Mick has failed to show why this use of his tax returns was unfairly prejudicial. *See Robinson v. Runyon*, 149 F.3d 507, 515 (6th Cir. 1998) ("Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest a decision on an improper basis."). Accordingly, we affirm the district court's decision allowing the use of Mick's tax returns to impeach Ritchie.

## D.  Mick's enterprise satisfied the statutory definition of an "illegal gambling business"

Mick next challenges the sufficiency of the evidence supporting the jury's conclusion that his activities constituted an "illegal gambling business" pursuant to 18 U.S.C. § 1955. In our review of his claim, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). We may not, however, "weigh the evidence, consider the credibility of witnesses or substitute our judgment for that of the jury." *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993).

An illegal gambling business is defined as an enterprise that

(i)   is a violation of the law of a State or political subdivision in which it is conducted;

(ii)  involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

18 U.S.C. § 1955(b)(1). Mick conceded at trial that his bookmaking activities violated Ohio law, and he does not dispute that his business fell within both prongs of subsection (iii) above. Instead, Mick claims that there was insufficient proof to show, beyond a reasonable doubt, that his business

business, and the district court's application of the United States Sentencing Guidelines.

Although Mick does not specifically challenge the other 71 counts on which he was convicted, he notes in his brief that they are all based on the underlying gambling conviction. *See* 18 U.S.C. § 1952(a)(3) (prohibiting the use of interstate facilities to further an illegal activity); 18 U.S.C. § 1956(a)(1)(A)(i) (criminalizing the intentional concealment of illegally obtained property); 18 U.S.C. § 1957 (criminalizing transactions in criminally derived property worth more than $10,000). A reversal of his § 1955 conviction, therefore, would require that all of the remaining convictions be vacated as well.

## II. ANALYSIS

## A.  The district court did not err in denying Mick's motion to suppress evidence that was discovered pursuant to the search of his house and trailer

Mick first challenges the district court's denial of his motion to suppress evidence that was discovered during the search of his house and trailer. (He does not challenge the search of his safety deposit box.) In his briefs to this court, Mick raises several issues with respect to Agent Mihok's affidavit that formed the basis of the magistrate judge's issuance of a warrant. First, he claims that the affidavit "contained material misrepresentations and deliberately misleading information." Second, he argues that the affidavit did not provide the magistrate judge with any information from which an assessment of the informants' knowledge or reliability could be made. Finally, Mick challenges the magistrate judge's conclusion that there was sufficient evidence in the affidavit to show probable cause.

### 1.  *Standard of review*

When reviewing a motion to suppress evidence, we will reverse factual findings of the district court only if they are clearly erroneous. Conclusions of law, however, are reviewed

de novo.  *See United States v. Leake*, 998 F.2d 1359, 1362 (6th Cir. 1993).

### 2.   *The sufficiency of Agent Mihok's affidavit*

A search warrant may be issued only "upon probable cause, supported by Oath or affirmation."  U.S. Const. Amend. IV. The neutral and detached magistrate charged with determining whether probable cause exists must decide if "there was a fair probability" that evidence or fruits of illegal activity are likely to be found at the place to be searched. *Illinois v. Gates*, 462 U.S. 213, 246 (1983).  When reviewing the decision to issue a warrant, a court faced with a suppression motion owes "great deference" to the issuing magistrate.  *See id.* at 236.  Indeed, our review is not de novo; rather, this court must uphold the issuance of a warrant so long as the magistrate "had a substantial basis for . . . conclud[ing] that a search warrant would uncover evidence of wrongdoing."  *Id*. (internal citations and quotations omitted) (ellipses and brackets in original).

The district court, in denying Mick's motion to suppress the evidence found in the trailer, concluded that "the magistrate had much more than sufficient evidence to find a fair probability that contraband would be present at that address." This conclusion was based on the results of the pen register, the interactions between Mick and known gamblers, and the observation of him spending time in places where officers had discovered betting paraphernalia.  The district court, noting that there was less evidence to support a finding of probable cause that evidence or contraband would be found at Mick's residence, still denied the motion to suppress evidence found at his house based on Agent Mihok's statements in the affidavit regarding what gamblers "usually" possess in their homes.  In particular, the district court determined that Mick's trailer was located in

> a trailer park on a busy road, and . . . it would not be reasonable for a person engaged in betting to leave large sums of cash or other betting materials at what appears to

shown that these records were kept for tax purposes.  Rather, as the government points out in its brief, Brodzinski testified at trial that these records were usually shredded soon after they were made.  Accordingly, we affirm the district court's decision to admit the balance sheets and wagering records.

### C.   The district court did not abuse its discretion when it allowed the use of Mick's tax returns to impeach his tax accountant

Mick challenges, on the grounds of relevance and unfair prejudice, the use of his personal income tax returns to impeach the testimony of James Ritchie, his tax accountant. He claims that these tax returns had no bearing on the factual issues before the jury, and that the jury may have been led to conclude that he filed false tax returns, a consideration that he alleges unfairly prejudiced the jury against him. Mick also makes a summary reference to a Fifth Amendment objection to this use of his tax returns, but does not explain the basis for this claim of error.  We therefore consider this constitutional challenge waived.  *See Buziashvili v. Inman*, 106 F.3d 709, 719 (6th Cir. 1997) (considering an argument as waived that was listed as an issue but not argued in the appellate briefs).

When Mick protested the government's use of the tax returns to impeach Ritchie, the district court overruled his objection, stating:

> It goes to the issue of specific intent [on the money laundering charges]. You opened the door by saying he keeps all these records and accurately reports his income. Having opened the door, if the government wants to show he doesn't accurately keep the information and convey it on his tax returns, I think it's admissible.

Mick does not address this ruling, but simply argues that "[t]hese tax returns were of no consequence to the determination of the pending charges."  He has therefore failed to carry his burden of showing that the district court abused its discretion on this issue.

The provisions of the Internal Revenue Code impose an excise tax on the net proceeds of those engaged in a gambling enterprise. As part of this statutory scheme, 26 U.S.C. § 4424(c) provides that,

> [e]xcept in connection with the administration or civil or criminal enforcement of any tax imposed by this title–
> (1) any stamp denoting payment of the special tax under this chapter,
> (2) any original, copy, or abstract possessed by a taxpayer of any return, payment, or registration made by such taxpayer pursuant to this chapter, and
> (3) any information come at by [sic] the exploitation of any such document,
> shall not be used against such taxpayer in any criminal proceeding.

This statute was enacted to protect the Fifth Amendment rights of defendants who, on the one hand, are compelled to pay taxes on the proceeds of their gambling enterprise, but also remain potentially liable on state criminal charges for those same gaming activities. *See Grosso v. United States*, 390 U.S. 62, 67 (1968) ("[P]etitioner's submission of an excise tax payment, and his replies to the questions on the attendant return, would directly and unavoidably have served to incriminate him").

Mick argues that the records of his customer balance sheets and wager records constituted documents protected by § 4424. When presented with this same argument, the district court held that

> these records, at least upon the representations made, were ones that were not being kept for purposes of the tax returns, but instead were being kept for the purposes of recording wagers as opposed to the overall tax issue. So I find that it's outside the protection afforded by § 4424.

Mick has provided no evidence indicating that this conclusion was incorrect, let alone an abuse of discretion. He has not

be an unguarded trailer on a busy road with seemingly no one living at this trailer.

Mick challenges the truthfulness of the affidavit supporting the warrant, detailing five principal concerns in his brief. First, in paragraph four of the affidavit, Mihok states that the surveillance between February of 1995 and November of 1996 showed that "Mick would always leave his residence . . . and go directly to his trailer." The surveillance summary, however, shows that on only 3 out of the 22 times Mick was observed in that year and a half did he go "directly" from his home to his trailer. When questioned on the stand, Mihok did not deny that this observation had only occurred three times.

In his second challenge to the veracity of the affidavit, Mick points to a statement made in paragraph five that, during this same period of police surveillance, Mick would meet "associates of his gambling business" at the M&M Sports Club "at least two to three times a week." The surveillance summary, however, places Mick at M&M's on only four occasions, none of which occurred in the same week. When asked about this inconsistency on the stand, Mihok seemed confused about the exact surveillance period that the affidavit was referring to, because later observations of Mick placed him at M&M with greater frequency. Paragraph five also states that Mick was "meeting with approximately seven to ten people" when he would visit M&M. Nevertheless, the identities of the people he was meeting were never provided in the affidavit. Again, Mihok acknowledged that the affidavit failed to make such a disclosure.

Third, Mick challenges paragraph eight of the affidavit, which stated that between October of 1996 and April of 1997, "[s]urveillances . . . have placed Bob Mick visiting Vernon Thomas at B.J.'s Car Wash . . . Thomas is a known bookmaker." Mick challenges this statement because, during the period of time referenced in the affidavit, he visited the car wash only twice, and was never observed with Thomas. When asked about this on the witness stand, Mihok replied that Thomas's car had been seen in the parking lot.

The fourth misstatement in the affidavit that Mick challenges is found in paragraph nine, in which Mihok stated that "[s]urveillances conducted . . . over the past six months have documented Bob Mick meeting with associates who are known gamblers or bookmakers." Four names of known gamblers are then listed as having met with Mick. Nevertheless, the surveillance records only show Mick meeting with one of the individuals listed in paragraph nine. When asked about this on the stand, Agent Mihok did not dispute that the other three individuals were never physically observed with Mick.

Mick's final challenge is to paragraph sixteen of the affidavit, which states that the observations between March 20 and May 18 of 1997, when the pen register was being utilized, indicate that "Mick would arrive at the trailer each day between the hours of 9:30 a.m. and 11:00 a.m. and would depart the trailer between the hours of 6:00 p.m. to 7:30 p.m." Nonetheless, when asked on the stand to "look at those three exhibits and direct [the court] to any surveillance [during that period] that puts Bob Mick at the trailer between 9:30 and 11:00 a.m. and between 6:00 and 7:00 p.m," Mihok responded "[n]o sir, none of these do."

These various mistakes, according to Mick, render the affidavit constitutionally infirm. Because of these "false and misleading" statements, he claims that the only thing left in the affidavit that the magistrate judge could have relied upon were the pen register results, which he argues are insufficient to support a finding of probable cause.

Mick correctly cites *Franks v. Delaware*, 438 U.S. 154 (1978), for the two-part test that we must use in evaluating claims of misleading statements contained in an affidavit. The test was summarized in *United States v. Charles*, 138 F.3d 257 (6th Cir. 1998), where this court said that

> a court considering whether to suppress evidence based on an allegation that the underlying affidavit contained false statements must apply a two-part test: (1) whether the defendant has proven by a preponderance of the

This court has held that an

> issuing judge or magistrate may give considerable weight to the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found and is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense.

*United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996) (internal citations omitted). Based on Mihok's experience and the exposed location of the often unoccupied trailer, it was reasonable to conclude that Mick's residence would contain gambling records and money. Mick has not provided sufficient evidence to overcome the deference that we must give to the magistrate judge's determination. *See Gates*, 462 U.S. at 236. Accordingly, we conclude, under the totality of the circumstances, that the warrant to search Mick's house and trailer was based on sufficient probable cause. We therefore find no error in the district court's denial of Mick's motion to suppress.

**B.   The district court did not err in admitting Mick's customer balance sheets and his handwritten records of wagers taken**

Mick challenges the admission at trial of his balance sheets and records of customer wagers. He claims that their admission violated 26 U.S.C. § 4424, as well as his Fifth Amendment right to be free from self-incrimination. As a threshold matter, both Mick and the government maintain that we review constitutional challenges to evidentiary rulings de novo. This is incorrect. In *Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 716-17 (6th Cir. 1999), this court held that all evidentiary rulings are subject to review for an abuse of discretion. This holding of *Trepel* was based on the Supreme Court's ruling on this issue in *General Electric Co. v. Joiner*, 522 U.S. 136, 141 (1997) (stating that "[a]ll evidentiary decisions are reviewed under an abuse-of-discretion standard"). We therefore apply the abuse of discretion standard of review to this claim of error.

which insist "upon substantial independent police corroboration" when there are doubts about an informant's reliability, were not lost on Agent Mihok. *See Allen*, 211 F.3d at 976. Indeed, with the help of the state police in Canton, Mihok corroborated Source 2's information about Mick's involvement in the distribution of parlay sheets by examining the trash at the M&M Sports Club. Furthermore, the general theme in the observations of all three informants was that Mick was well-connected and well-traveled in the gambling world of Alliance, Ohio. This fact was corroborated by the police surveillance of Mick's interactions with known gamblers and bookmakers, as well as his frequenting of establishments where gambling was going on. Although Mick has placed the frequency of these travels in question, he has not shown that he *never* visited these individuals and establishments. Finally, the pen registers, which confirmed that Mick was receiving a high volume of telephone calls in the trailer, and was transmitting a high volume of information from the facsimile machine, provided even more evidence that the locus of Mick's gambling enterprise was in his trailer. All of this data, in addition to the observations of the informants, provided enough information to support the magistrate judge's conclusion that there was a fair probability that evidence of an illegal gambling business would be found in Mick's trailer.

Although the information proffered in the affidavit with respect to Mihok's request for a warrant to search Mick's residence was weaker, it was still sufficient. Much of the affidavit supporting this portion of the search warrant request relied on Mihok's experience that those who operate gambling businesses store money and records in their residence, even if their home is separate from their principal place of business. Mihok stated that gamblers like Mick "often possess large sums of currency; and . . . this currency is often hidden or concealed in hiding places at their residences or place of business."

evidence that the affidavit contains deliberately or recklessly false statements and (2) whether the affidavit, without the false statements, provides the requisite probable cause to sustain the warrant.

*Id*. at 263. Mick's challenge fails on both prongs.

### a.  The affidavit's misstatements were not deliberate, reckless, or material to the magistrate's probable cause determination

First, although the district court did not hold a *Franks* hearing to determine the extent to which the alleged misstatements satisfy the two-part test, it did conclude that "[t]he evidence before this court, even if construed in favor of the defendant, cannot be understood to show that Agent Mihok gave either a knowingly false affidavit or otherwise acted in bad faith." Mick has not produced any evidence to show that this finding of fact was clearly erroneous. Furthermore, Mihok's testimony on the stand indicates that, at worst, he was confused about the dates on which different things were observed over the two years that Mick was under surveillance. This does not rise to the level of deliberate or reckless misstatements as required by *Franks*.

### b.  The affidavit otherwise supported the magistrate's conclusion that probable cause existed to search Mick's house and trailer

Second, the government has shown that "the affidavit, without the false statements, provides the requisite probable cause to sustain the warrant." *Charles*, 138 F.2d at 262. It points out that the claimed misstatements do not undermine the fact that Mick was observed at locations where known gamblers congregated and where betting slips and parlay sheets were discovered. Whether these visits occurred once a week, twice a week, or only four times during the surveillance period does not alter the fact that these activities made it probable that Mick was engaged in some sort of gambling enterprise. Similarly, the actual schedule of his mornings visits, including whether he went directly to his

trailer or to other parts of Alliance first, did not undermine the veracity of the entire affidavit.

The remainder of Mick's challenge to the search warrant rests on whether there was sufficient evidence to support the magistrate judge's finding that there was a fair probability that gambling records and other proceeds of a gaming business would be located in Mick's house and trailer. In particular, Mick questions the use of the three confidential informants. He claims that without this evidence, there was insufficient proof to establish probable cause.

The test that we apply to this claim of error is the "totality of the circumstances." *Gates*, 462 U.S. at 230-31. Although we must avoid simply "rubber stamping" the conclusions of the magistrate judge, we should equally avoid engaging in a hypertechnical, line-by-line critique of an affidavit. *See id*. at 236. We should instead conduct a common sense review of the affidavit and ask if the issuing magistrate, using a "practical" and "common-sense" analysis, correctly determined under "all the circumstances set forth in the affidavit," that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. at 238.

In *Gates*, the Court addressed the constitutionality of a warrant that was based on a tip in an anonymous handwritten letter, which described a rather intricate drug-trafficking scheme by the defendant. The Court concluded that this tip, standing alone, would not have been sufficient to support a search warrant, because the letter indicated "virtually nothing from which one might conclude that the author [was] either honest or his information reliable." *Gates*, 462 U.S. at 227. But the police, after receiving the letter, corroborated certain details, such as the fact that the defendant flew from Chicago to Florida, and returned to Illinois in a car shortly after his arrival in West Palm Beach. Because the police officers supplemented their request for a warrant with an investigation that corroborated certain details of the letter, the issuance of the warrant was sustained. *Id*. at 241-46.

This court in *United States v. Allen*, 211 F.3d 970 (6th Cir. 2000) (en banc), addressed a different question – the minimum amount of proof required to affirm the issuance of a warrant based on the bare allegations of an informant without any supporting corroboration. The affidavit in *Allen* stated that the informant had proven to be reliable in the past, and that the informant had observed contraband in Allen's apartment firsthand. *Allen* sustained the validity of the search warrant based on the firsthand knowledge and past reliability of the informant, without any independent corroboration by the police. Mick argues, however, that the reliability of the three informants in the present case is less convincing than in *Allen*.

Although the affidavit states that both Source 1 and Source 2 have "been proven to provide accurate information in the past," Mihok did not state whether the information provided in the past also led to a successful prosecution. Furthermore, Mick points out that nothing in the affidavit indicates whether or not they observed Mick's gambling business firsthand. Mick also questions the reliance on CW 1 where there was no proof of his reliability, and where Mihok did not even question CW 1's eyewitness companion. Mihok's inclusion of information derived from the statements of CW 1, therefore, constitutes double hearsay.

Although an affiant's statements may come from the double hearsay of an informant, *see United States v. Jenkins*, 525 F.2d 819, 823 (6th Cir. 1975), CW 1's reliability is bolstered in the affidavit only by the fact that he is allegedly a law-abiding citizen. *Cf. United States v. Martin*, 920 F.2d 393, 398-99 (6th Cir. 1991) ("[I]t is often people involved in criminal activities themselves that have the most knowledge about other criminal activities."). To be sure then, as in *Gates*, had the affidavit relied solely on these informants, there might not have been enough evidence to establish probable cause. *See Gates*, 462 U.S. at 227.

Mihok, however, did not rely solely on the statements of the informants. The requirements of the Fourth Amendment,