NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0894n.06

No. 11-5003

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Aug 14, 2012**

LEONARD GREEN, Clerk

RICK COTTON,                                )
                                            )
            Plaintiff-Appellant,            )       ON APPEAL FROM THE UNITED
                                            )       STATES DISTRICT COURT FOR THE
v.                                          )       MIDDLE DISTRICT OF TENNESSEE
                                            )
CITY OF FRANKLIN,                           )              **OPINION**
                                            )
            Defendant-Appellee.             )

Before:  ROGERS and STRANCH, Circuit Judges; PEARSON, District Judge.[*]

**PER CURIAM.**  Plaintiff Rick Cotton appeals the district court's decision to exclude

evidence at trial in this case alleging retaliation and hostile work environment.  Cotton believes the

erroneous exclusions warrant a new trial.  We affirm the district court's decision.

## I.  BACKGROUND

### A.  Factual History

Cotton, who is African American, has been employed by the Franklin Fire Department, a

division of the City of Franklin ("the City"), since 1987.  Cotton currently holds the rank of

Lieutenant.  In 2005, Cotton, along with other African American firefighters including Assistant

Chief Greg Baltimore, filed a lawsuit against the City, alleging disparate treatment and a hostile work

environment because of race.  In 2007, Cotton accepted $250,000 in exchange for dismissing the suit

---

[*]The Honorable Benita Y. Pearson, United States District Judge for the Northern District
of Ohio, sitting by designation.

and signing a Release and Settlement Agreement.  As of the date of the signing of the agreement,

and under the release, Cotton agreed to:

> release, acquit and forever discharge the City . . . from any and all claims, causes of action, demands, rights, damages, back pay, front pay, disbursements, and all other claims of every nature whatsoever which [Cotton] now has or which may hereinafter accrue to him on account of, or in any way, growing out of any and all known and unknown, foreseen and unforeseen, physical and or mental injuries and/or any damage of any kind whatsoever, and the consequences thereof and/or expenses incurred or sustained . . . as a result of or in any way related to or arising out of [Cotton's] employment by the City of Franklin.

R. 19-1, Release and Settlement Agreement, at Page ID 174.

Cotton claims that, after the lawsuit was settled and he returned to the fire station, he was

subjected to a continuous racially hostile work environment and found himself singled out as a result

of filing the lawsuit.  Shortly after resolution of the lawsuit, Cotton alleges to have witnessed

Assistant Chief Gentry Fox, one of his superiors, telling other firefighters that the "blacks" should

not have gotten promoted or received money for their discrimination claims in the lawsuit.

In 2007, after the settlement agreement in the first lawsuit was signed, Cotton applied to fill

one of three open Captain positions with the Franklin Fire Department.  In the promotion process,

applicants were scored in categories of seniority, education, training, an interview with the Chiefs,

and a third-party-run "assessment center" that measured tactical skills, oral presentation, and skill

in dealing with a problem employee.  The candidates were then ranked on a certification list based

upon their scores.  Out of the eight people who applied for a Captain position, Cotton ranked fifth

on the certification list.  Based on department selection procedure, since three positions were open,

Fire Chief Garzarek had the ability to select from the top seven candidates on the list.  For the three

2

open Fire Chief positions, Garzarek selected the candidates ranked first, second, and fourth, all of whom are white. Garzarek claims that it is his typical practice to promote candidates based solely on their rank and that he has skipped ranks very few times. Garzarek testified that, in this instance, he skipped over the candidate ranked third because of an allegation that the third-ranked candidate attempted to have an affair with the wife of one of his subordinates and Garzarek felt that this allegation, if true, reflected poorly upon the candidate's character and integrity.

Cotton testified that he should have scored higher on the Chief's Interview portion of the promotion process and that some of the individuals on the Interview panel were biased against him. The panel for the Chief's Interview consisted of Fire Chief Rocky Garzarek, Deputy Chief Mike Culberson, and Assistant Chiefs Gentry Fox, Greg Baltimore, and Eddie House. On the Interview portion, Cotton received his lowest scores from Chiefs Garzarek, Fox, and Culberson. Cotton testified that, had he received a higher score from these three panelists, he would have ranked third on the certification list instead of fifth. Cotton also testified that the score sheets show no differences in the answers of Cotton versus those of the white candidates, and that this allegation demonstrates the subjectiveness of the scores that were given. Additionally, Cotton alleges to have been subjected to further hostile and retaliatory treatment by superiors in the fire department after going through the promotional process.

## B. Procedural History

On March 3, 2009, Cotton filed a second lawsuit against the City, which alleged violations of Title VII, 42 U.S.C. §2000e, *et seq.*, and the Tennessee Human Rights Act, including retaliation

3

in regard to his failure to be promoted to Captain, a racially hostile working environment, and claims

not relevant to this appeal. At trial, the jury rendered a verdict in favor of the City.

## II. DISCUSSION

### A. Standard of Review

This court reviews a district court's denial of a motion for a new trial under an abuse of

discretion standard. *Tobin v. Astra Pharm. Prods., Inc.*, 993 F.2d 528, 542 (6th Cir. 1993). The

same standard applies to our review of a district court's evidentiary rulings. *United States v. Mick,*

263 F.3d 553, 566 (6th Cir. 2001). "Abuse of discretion is defined as a definite and firm conviction

that the trial court committed a clear error of judgment." *Tobin*, 993 F.2d at 542 (quoting *Logan v.*

*Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir. 1989)). A district court abuses its discretion

when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an

erroneous legal standard. *Romstadt v. Allstate Ins. Co.*, 59 F.3d 608, 615 (6th Cir. 1995).

Moreover, a motion for a new trial will not be granted unless the moving party suffered

prejudice. *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 514 (6th Cir. 1998); *Erskine v. Consol.*

*Rail Corp.*, 814 F.2d 266, 272 (6th Cir. 1987) (holding that "a new trial will not be granted on the

ground that surprise evidence was admitted unless the moving party was prejudiced"). "Even if a

mistake has been made regarding the admission or exclusion of evidence, a new trial will not be

granted unless the evidence would have caused a different outcome at trial." *Morales,* 151 F.3d at

514. "The burden of showing harmful prejudice rests on the party seeking the new trial." *Tobin,* 993

F.2d at 541 (citation omitted); *see also Erskine,* 814 F.2d at 272 ("In order to prevail on his motion

for a new trial, plaintiff must show that he was prejudiced and that failure to grant a new trial is inconsistent with substantial justice." (citations omitted)).

### B. Issues on Appeal

Cotton argues that the district court excluded key evidence from being presented at trial and that the exclusion of this evidence constituted error to such an extent as to warrant a new trial. Cotton sought to introduce at trial deposition testimony from two employees of the City, records clerk Irma Eichner and white firefighter Jason Jones, in which the employees testified having witnessed two superiors of Cotton refer to African American employees as "niggers." Additionally, Cotton sought to introduce into evidence an email that was sent to employees of the Franklin Fire Department by a white superior, Captain Joe Polenzani, which Cotton found offensive because it discussed the lynching of African Americans and whether the term "picnic" was derived from this practice. The district court excluded the deposition testimony by reasoning that its inclusion was barred by the Release and Settlement Agreement that Cotton signed in concluding his first lawsuit against the City. Meanwhile, the district court excluded the email from being introduced into evidence by reasoning that it lacked probative value to the claims Cotton presented at trial.

**1. Did the district court abuse its discretion excluding the deposition testimony of Irma Eichner and Jason Jones, employees of the City, who testified that Chiefs Garzarek and Fox, both panelists on the Chief's Interview portion of the promotion process that Cotton underwent, used the word "nigger" when referring to Cotton and other African American employees?**

Cotton argues that the district court erred by not admitting the deposition testimony of Eichner and Jones when it ruled that inclusion of such testimony was barred by the 2007 settlement agreement that Cotton signed to conclude his first lawsuit against the City. In the state of Tennessee,

"a release is a contract and rules of construction applied to contracts are used in construing a release." *Richland Country Club, Inc. v. CRC Equities, Inc.*, 832 S.W.2d 554, 557 (Tenn. Ct. App. 1991). The Release and Settlement Agreement that Cotton signed acknowledged this fact by including language that stated "the terms of this release are contractual in nature and not a mere recital." R. 19-1, Release and Settlement Agreement, at Page ID 175. While a "general release covers all claims between the parties which are in existence and within their contemplation," claims "which have not matured or were not known to the parties when they executed their release and which they did not intend to affect when the settlement was made are not discharged by a release." *Richland*, 832 S.W. 2d at 557 (quoting *Jackson v. Miller*, 776 S.W.2d 115, 118 (Tenn. Ct. App. 1989)).

In determining what evidence or claims are covered by a release agreement, the "cardinal rule is to ascertain the intention of the parties." *Richland*, 832 S.W. 2d at 557. In the release agreement signed by Cotton, he agreed to release the City from

> any and all claims, causes of action, demands, rights, damages, back pay, front pay, disbursements, and all other claims of every nature whatsoever which the undersigned releasing party now has or which may hereinafter accrue to him on account of, or in any way, growing out of any and all known and unknown, foreseen and unforeseen, physical and or mental injuries and/or any damage of any kind whatsoever, and the consequences thereof and/or expenses incurred or sustained by the Releasing Party as a result of or in any way related to or arising out of the Releasing Party's employment by the City of Franklin.

R. 19-1, Release and Settlement Agreement, at Page ID 174. The Release and Settlement Agreement went on to state that the "Releasing Party and Released Party desire to settle fully and finally all differences between them including, but not limited to, the differences embodied in the complaint

6

filed by the Releasing Party" in the first lawsuit and "all charges filed by Releasing Party with the United States Equal Employment Commission." *Id*. Additionally, the City agreed to "indemnify and hold the Released Party harmless with reference to any liens or subrogation claims from any source whatsoever and from further claims, demands, costs or expenses arising out of the injuries sustained by the Releasing Party." *Id*. at Page ID 175.

Sixth Circuit case law, however, makes clear that "[a] general release prevents suits for damages that 'might have been expected to result and were in fact caused' by pre-release actions," but "a release 'cannot operate prospectively so as to defeat an action which arises at a time [ ]after' the parties sign the release." *Watson Carpet & Floor Covering, Inc. v. Mohawk Ind., Inc.*, 648 F.3d 452, 460 (6th Cir. 2011) (examining a settlement agreement and release in a conspiracy claim) (quoting *Sherman v. Am. Water Heater Co.*, 50 S.W.3d 455, 459 (Tenn. Ct. App. 2001)). Therefore, the broadly written agreement entered into by Cotton and the City does not bar Cotton's use of evidence existing prior to the signing date of the settlement agreement in support of a later accrued claim.

The analysis, however, does not end there. We must examine how Cotton's two remaining arguments relate to this Sixth Circuit precedent governing later accrued claims. First, for a hostile work environment claim, evidence of racial animosity is relevant to determine work place hostility at the time the statement was made. The Eichner and Jones testimony concerns statements made during the period covered by Cotton's *first* hostile work environment lawsuit. Because this testimony supported a hostile work environment claim that accrued before the date of the settlement

agreement, the release bars use of the testimony as evidence in Cotton's *second* hostile work environment claim that spans a time period subsequent to the release.

Cotton's failure-to-promote retaliation claim presents a different issue. There the testimony could be offered to provide evidence of the discriminatory mind set of both Garzarek and Fox in the months before Cotton was passed over for promotion. Because Cotton's retaliation claim did not accrue until he was denied the promotion, the Release and Settlement Agreement would not bar admission of the testimony as it is evidence existing prior to the signing date of the settlement agreement used in support of a later accrued claim. The City alleges that Cotton failed to argue at trial, or in his Motion for a New Trial, that this permissible purpose existed for admitting the testimony or that he would limit his use of the testimony to this basis. Therefore, the City argues Cotton has waived the issue of whether the testimony was admissible as proof of animus for his retaliation claim.

We have held that issues "not squarely presented to the trial court are considered waived and may not be raised on appeal." *Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1160 (6th Cir. 1996).[1] However, "a court may review the introduction [or exclusion] of evidence in the absence of an objection if it constitutes plain error and affects a party's substantial rights." *Helminski v. Ayerst Lab.*, 766 F.2d 208, 211 (6th Cir. 1985) (citing Fed. R. Evid. 103(d)). "[W]hether or not the

---

[1]Without directly addressing the omission below, Cotton presses *Ash v. Tyson*, 546 U.S. 454 (2006) for the proposition that an employer's discriminatory statements may form the basis for an inference of discrimination and establish pretext in an employment decision. *Ash* held that a plant manager's repeated reference to two adult, male, African American employees as "boy" could be evidence of discrimination in the failure of the plaintiffs to be promoted. 546 U.S. at 456. Trial courts are not expected to guess at reasons to sustain admissibility.

circumstances of a particular case justify deviation from the normal rule of waiver is left largely to the discretion of the appellate court." *Fryman v. Federal Crop Ins. Corp.*, 936 F.2d 244, 251 (6th Cir. 1991). Given the general rule that issues not raised in the district court are waived on appeal, and because Cotton fails to provide a single reason, much less a compelling one, explaining why he failed to request admission of the testimony as relevant to his retaliation claim or why we should exercise our discretion to consider it for the first time here, we find that Cotton waived his right to appeal this issue.

> **2. Did the district court abuse its discretion by excluding from evidence Cotton's Exhibit No. 9, an email sent by Captain Joe Polenzani to employees of the fire department that discussed the lynching of African Americans and whether the term "picnic" was derived from this practice?**

As part of his case to establish the existence of a racially hostile work environment, Cotton sought to introduce into evidence an email, sent by Captain Joe Polenzani to employees of the Franklin Fire Department, which discussed whether the term "picnic" originated from the practice of lynching African Americans. Captain Polenzani sent the email after an African American instructor suggested such a connection during a diversity class that Franklin firefighters attended. Polenzani claims to have intended the email to correct what he perceived to be a misstatement by the diversity instructor; Cotton, however, found the email offensive. Cotton was offended by what he saw as an attempt by Polenzani to discredit the African American instructor and to stir up Caucasian firefighters because their African American co-workers had just settled a discrimination lawsuit. Cotton was also offended by the use of the word "nigger" on a website that was hyperlinked in the email, although the offending passage did not appear in the email itself.

Cotton argues that the district court erred in not admitting into evidence the email by ruling that it lacked probative value to Cotton's claims of retaliation and a racially hostile work environment. When Cotton attempted to introduce the email into evidence by illustrating how it impacted him under the elements of a hostile environment claim, the district court stated that the email had "absolutely no bearing" and "no probative value to [the] lawsuit whatsoever." R. 122, Transcript, at Page ID 1233-36. Cotton claims that the email was one in a "series of actions against him and other African American employees which create[d] a hostile work environment." As such, Cotton argues that the district court erred in viewing the email as a separate, isolated act, and he claims that the email should have been admitted into evidence and been allowed to be seen as but one part of the totality of circumstances constituting a racially hostile work environment.

The district court excluded the email from evidence by reasoning that it lacked probative value to Cotton's claim of a hostile work environment and by reasoning that the email was not offensive. Cotton argues that the district court erred when it decided that the email was not offensive to African Americans in his position, and that the court erred by viewing the email as an isolated, separate act instead of as one part of the totality of circumstances in a racially hostile work environment.

The City argues that the district court did not err when excluding the email for lack of probative value. The City points out that the alleged offending paragraph, which twice included the word "nigger," was not contained in the actual email itself, but was instead found on a website that was hyperlinked in the email. The City argues that the email, which was intended to correct misinformation provided by a trainer during a diversity class, was not objectively harassing based

10

on race even though Cotton may have found the email offensive. However, if the evidence were to be included, the City claims that the use of the word "nigger" on the hyperlinked website would unfairly prejudice the jury and, thus, the probative value of the email would be outweighed by its prejudicial effect.

Both this court and the U.S. Supreme Court have held that, in analyzing claims of a hostile work environment, evidence must be viewed in regard to its surrounding circumstances. In *Jackson v, Quanex Corp.*, 191 F.3d 647 (6th Cir. 1999), we reasoned that analyzing in isolation each alleged offensive event of a hostile work environment claim "would defeat the entire purpose of allowing claims based upon a 'hostile work environment' theory, as the very meaning of 'environment' is '[t]he surrounding conditions, influences or forces which influence or modify.'" *Id*. at 660 (alteration in original) (quoting Black's Law Dictionary 534 (6th ed. 1990)). In light of this reasoning, we emphasized that "offensive comments need not be directed at a plaintiff in order to constitute conduct violating Title VII." *Jackson*, 191 F.3d at 660. In reaching the decision in *Jackson*, this court relied upon the holding of the U.S. Supreme Court in *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993). In *Harris*, the Supreme Court held that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Id*. at 23. The Court explained that these circumstances "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*

Following the reasoning in *Jackson* and *Harris*, the district court arguably should have admitted the email, sent by Captain Polenzani, in regard to its surrounding circumstances and,

therefore, abused its discretion by failing to admit the email into evidence. In determining that the email had no bearing on Cotton's claims, the district court focused upon the fact that the use of the word "nigger" was from a website that was hyperlinked in the email and that the offending word was not written by Captain Polenzani himself. However, the district court did not take into account the potential offensiveness of the email when considered in light of the fact that it was sent in reference to a diversity training class that firefighters were required to attend following the settlement of racial discrimination lawsuits filed by some of the African American employees of the City. Cotton was offended not only by the use of the word "nigger" on the website that the email provided a hyperlink to, but also by what he perceived to be an attempt by his white superior to discredit the black instructor of the diversity class. Cotton saw the emails as an effort by Polenzani to create a racially hostile work environment in the firehouse by attempting to stir up the resentment of white firefighters concerning the recently settled race discrimination lawsuit and required diversity classes. When viewed in these surrounding circumstances, the email sent by Captain Polezani to the employees of the Franklin Fire Department arguably possessed some probative value in regard to Cotton's claim of a racially hostile work environment and the district court erred by excluding the email from evidence.

Even if the district court erred in excluding the email sent by Captain Polenzani, however, the exclusion did not constitute reversible error.

When reviewing a district court's evidentiary rulings for abuse of discretion, this Circuit has held that such a ruling may be reversed "only if the abuse of discretion caused more than harmless error." *Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 897 (6th Cir. 2004). Thus, even if a

mistake regarding an evidentiary ruling is found, this court shall not grant a new trial unless inclusion of the disputed evidence "would have caused a different outcome at trial." *Id*. at 891 (citation omitted). The City argues that inclusion of the email into evidence would not have caused a different outcome at trial since the jury heard about the substance of the email and the circumstances surrounding it when Cotton was questioned by the district court regarding the details of the email. Thus, the City argues that since the jury heard what the email said, seeing the email itself would have been highly unlikely to have changed the minds of any of the jurors. The City also claims that the use of the word "nigger" on the website hyperlinked in the email would have unfairly prejudiced the jury if the email had been allowed into evidence. Thus, the City argues that even if the email was relevant to the claims of Cotton, its exclusion was proper since the probative value of the email was outweighed by the prejudicial effect it would have had on the jury.

Even if the district court's decision to exclude Captain Polenzani's email from evidence was an error, it does not constitute reversible error since it is unlikely that inclusion of the email would have caused a different outcome at trial. The jurors heard about the substance of the email and the circumstances surrounding it when Cotton was questioned by the district court regarding the details of the email. Prior to this examination by the district court, Cotton also testified about the effect that the email had on him personally and what he perceived to be its connection to a racially hostile work environment. The jury was, therefore, familiar with both the contents of the email and what Cotton perceived to have been the intentions of Captain Polenzani in sending the email to employees of the Franklin Fire Department. The ability of the jurors to view the actual email itself is unlikely to have

13

changed the minds of any of the jurors and to have caused a different outcome at trial.  Thus, the decision of the district court in denying Cotton's Motion for a New Trial should be affirmed.

### III.  CONCLUSION

For the foregoing reasons, we affirm the district court's denial of Cotton's Motion for a New Trial.